Robert E. **HARRIS** and Dorothy H.
Harris, Plaintiffs,

v.

**UNITED STATES** of America,
Defendant.

No. 999.

United States District Court
S. D. West Virginia,
Huntington Division.

Jan. 21, 1966.

W. E. Parsons, Huntington, W. Va.,
William G. Wilson, Logan, W. Va., for
plaintiffs.

Richard M. Roberts, Acting Asst. Atty.
Gen., Russell L. Davis, Dept. of Justice,
Washington, D. C., Milton J. Ferguson,
U. S. Atty., George D. Beter, Asst. U. S.
Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action brought by plaintiffs,
under 28 U.S.C.A. § 1346(a) (1), to re-

cover federal income taxes in the sum of $3,221.30, paid under protest for the years 1954, 1955 and 1956. The parties by mutual agreement have submitted the case to the Court, sitting without a jury, for determination of the issues involved.

A stipulation of facts was entered into and agreed upon by the respective parties. It is shown in its entirety in an appendix to this opinion.

Based on this stipulation of facts, the exhibits and depositions of record, we must hold, for the reasons shown, that the Internal Revenue Service was correct in treating plaintiffs' returns in 1954, 1955 and 1956 as unreported dividends and assessing the deficiency complained of.

The resolution of two basic issues, we think, quite clearly determines the outcome of this case. They are (1) whether or not the income credited to the beneficiaries' accounts in 1948, 1949 and 1950 was income "currently distributable," for purposes of Internal Revenue Code Section 662, making it then taxable to the beneficiaries, and (2) whether payments to Harris, Inc., by the executors were contributions to capital, thus making the payments received by plaintiffs during the years 1954, 1955 and 1956 distributions taxable as dividends defined in Section 316 of the Internal Revenue Code of 1954, or whether these payments made to the corporation were loans, thus making the repayment of such loans taxable only on the portion which represented interest.

## I

■ The handling of the estate and trust as set forth in the will of B. C. Harris required the executors to pay all of his just debts including Federal Estate and State Inheritance Taxes before any distribution of his estate was made, and in the event that at the time of his death there were insufficient liquid assets to pay all of his just debts, including Federal Estate Tax, State Inheritance Tax, and other taxes, the executors were directed to sell or encumber so much of the real estate as was necessary for that purpose. From the deposition of Mrs. Harris, a plaintiff and an executrix under the will, it was evident that the estate at the time of Mr. Harris' death did not have enough cash to pay the aforementioned taxes. Mrs. Harris explained that since real estate values were rising at that time, the executors and beneficiaries had agreed that the net income belonging to the trust would be credited to the beneficiaries, but would be used for the payment of the Federal Estate and West Virginia Inheritance Taxes. By such plan, the executors and beneficiaries would benefit twofold: (1) Gain an obvious tax advantage by crediting the beneficiaries with the net income so as to reduce the net income of the estate taxable as an entity, and (2) avert the necessity of selling the valuable real estate of the estate. It is plain, however, from a reading of the will and the pertinent provisions of the Internal Revenue Code [1] that the effect of these manipulations were in fact tax evasive rather than a prudent attempt to minimize taxes. As previously mentioned, the will specifically provided that there was to be no distribution of income until the taxes and other indebtedness had been paid. It is well established

---

1. Sec. 661: Deduction for Estates and Trusts Accumulating Income or Distributing Corpus.

"(a) Deduction—In any taxable year there shall be allowed as a deduction in computing the taxable income of an estate or trust (other than a trust to which subpart B applies), the sum of—

"* * *

(2) any other amounts properly paid or credited or required to be distributed for such taxable year."

Sec. 662: Inclusion of Amounts in Gross Income of Beneficiaries of Estates and Trusts Accumulating Income or Distributing Corpus.

"(a) Inclusion—Subject to subsection (b), there shall be included in the gross income of a beneficiary to whom an amount specified in section 661(a) is paid, credited, or required to be distributed (by an estate or trust described in section 661), the sum of the following amounts:

"* * * * *

"(2) Other Amounts Distributed—All other amounts properly paid, credited, or required to be distributed to such beneficiary for the taxable year. * * *"

that executors' power and authority are defined and limited by the will and their assumption of duties as executors requires that their conduct be consonant with the directions of the will and not in conflict therewith. 21 Am.Jur., Executors and Administrators, Sections 3 and 208 (1939); Harrison v. Miller, 124 W. Va. 550, 21 S.E.2d 674 (1942); 8 M.J., Executors and Administrators, Section 60 (1949). Thus, the executors under the will lacked authority, in both law and fact, to credit the $207.714.58 to the beneficiaries' accounts before the taxes were paid. Plaintiffs contend, however, that Igoe v. Commissioner of Internal Revenue, 19 T.C. 913 (1953), is controlling here. From a careful reading of that case it is quite distinguishable. There, the will of Andrew J. Igoe provided that after the payment of all the debts and testamentary expenses, the estate was to be split among several beneficiaries. There, as here, the issue was whether net income of the estate was properly credited to the beneficiaries so as to come within the appropriate sections of the Code. The Court held that such income was properly credited. The all-important distinguishing factor, however, was that the assets of the estate of Andrew J. Igoe were more than adequate to provide for the payment of all obligations of the estate including debts, taxes, and administrative expenses, without use of the 1941 net income involved in those proceedings and it was so noted by the Court.

In the case Estate of C. R. Hubbard, 41 B.T.A. 628 (1940), what we consider an analogous situation to the case at bar, the Court interpreted "properly credited" as contemplated by Sections 661 and 662 of the Code. There the will of the decedent provided that it was the duty of the executors to pay all administrative expenses and the inheritance taxes payable to the State of West Virginia and then to distribute to the beneficiaries the residue of the estate in accordance with the directions of the will. The executors, however, took up with the heirs and legatees the advisability of paying the state inheritance taxes from the income of the estate instead of obtaining money for their payment from the sale of income-producing securities. This procedure was followed and accordingly the money that was credited to the heirs or legatees was used for the payment of the taxes. The Court, in holding that the income was not properly credited, stated,

"The credit which was made to the beneficiaries' shares was not made with any expectation that the amount would ever be paid over to the beneficiaries. At the time the credit was made it was known that the money would be needed and would be used for the payment of West Virginia inheritance taxes. The executors are charged with the duty of paying those taxes before the estate is distributed. * * * In this situation we do not think that the income of the estate was 'properly' credited to the beneficiaries * * *."

Therefore, where a credit is made on the executor's books, but where the income is actually used for the payment of inheritance taxes, we must hold, in light of the *Hubbard* decision, that here, as a matter of law, the income is taxable to the estate and not properly credited to the beneficiaries. In Commissioner of Internal Revenue v. Stearns, 65 F.2d 371 (2d Cir. 1933), the Court stated that a mere entry on the books of the fiduciary will not serve unless made in such circumstances that it cannot be recalled. Plaintiffs claim here that it is established that the income was so credited as to be beyond the point of recall. The circumstances in this case, however, do not bear out this claim. It is evident that the intention of the parties involved was for the co-executors to use this credited income for the payment of estate and inheritance taxes. The deposition of Mrs. Harris, executrix and beneficiary, leads us to no other conclusion, portions of which are as follows:

"Q. May I ask you another question now, Mrs. Harris? I notice that

the estate of your husband did not sell its assets to pay the estate tax liability.

"A. There wasn't anything sold.

"Q. Why wasn't that sold?

"A. Well, for the same reason I said. It was real estate and at that time real estate was just becoming a little bit more valuable, going up, and I didn't feel like it was necessary to sacrifice it when we had our inheritance cash that we could put to that use. If we hadn't had, I would have gone to the bank and borrowed money rather than sacrifice the property.

\* \* \* \* \* \* \*

"Q. Why is it that the estate did not make cash distributions or property distributions of these earnings to the three beneficiaries?

"A. Well, the boys had a living of their own and they set up an allowance, a widow's allowance, for me to live on until the estate was settled \* \* \*.

\* \* \* \* \* \* \*

"Q. Why didn't they distribute the earnings in cash or in property to the three beneficiaries? Was it to hold the property together?

"A. Mr. Harris directed that the property be put into—to form Harris, Inc., to separate the two businesses. It was his request that we form these two corporations."

Thus, we can only hold that any income that was credited by the executors did not actually belong to the beneficiaries, but rather was controlled and used by the executors for the payment of taxes so as to hold the property together. Even assuming that a portion of such income was credited to the beneficiaries beyond recall, the fact that the executors lacked authority to make any distribution of income in the first place, as previously mentioned, would nullify its legal effect.

### II

██ · Having decided that the alleged distribution of income was not properly credited to the beneficiaries, the resolution of this second issue becomes academic.

Plaintiffs have assumed throughout: (1) That a loan was made to the executors by the beneficiaries of the distributable income, and (2) that such loan incurred by the executors was assumed by Harris, Inc., as a debt. Based on these assumptions, they insist that the loans assumed by Harris, Inc., did not constitute contributions to capital and, therefore, payments made to the beneficiaries by Harris, Inc., were in payment of this loan and not dividend income. Believing that plaintiffs' basic assumptions have been destroyed, the factual issue pertaining to the payments made by Harris, Inc., to the beneficiaries no longer exists.

Plaintiffs contend that the $207,714.58 distributable to the beneficiaries as income was loaned back to the executors. Having held that as a matter of law and fact such income was not properly credited or distributed to the beneficiaries, they logically were not in the position to loan income to the executors that they never received. The income was taxable to the estate and, therefore, belonged to the estate free of indebtedness. Even assuming that the beneficiaries were entitled to the income and did loan such money to the executors, their second assumption that Harris, Inc., assumed this loan cannot stand. The will of B. C. Harris specifically provided that not until all debts, taxes, and other liabilities were paid were the executors to form Harris, Inc., and transfer the trust property to the corporation. Thus, transferring of the trust property to Harris, Inc., with the outstanding loan was in clear violation of the testator's intentions and, as previously mentioned, something the executors could not lawfully do. Therefore, we hold that at the time of the formation of Harris, Inc., the transfer of the trust property to it necessarily had to be free of indebtedness. Plaintiffs' attempt to evade this obvious conclusion

and to establish an indebtedness .is reflected in the controversial entry made on the books of Harris, Inc. a year after its formation, which appears as follows:

"Surplus—Paid-In                                                    $244,512.01
    Mrs. Lula M. Harris        $146,334.85
    R. E. Harris                  54,640.99
    Carl F. Shelton               43,536.17

        "This entry made to repay advancements on Federal Estate and West Virginia Inheritance Taxes on the Estate of B. C. Harris

            Notes Payable                                  $244,512.01"

This bookkeeping entry being nothing more than an attempted assumption of a non-existent loan, it quite naturally can have no legal effect.[2]

In conclusion, we hold that when Harris, Inc., was formed and the trust property transferred free of indebtedness to it in return for the issuance of capital stock, such transfer constituted a contribution to capital and .was so noted on the opening entry of the corporation's books (Appendix, p. 385). Therefore, any distribution made by the corporation to plaintiffs, as sole stockholders, out of its earnings and profits would be with respect to its stock and capital holdings only and distributable to plaintiffs as stockholders of the corporation, not as beneficiaries under a terminated trust holding an outstanding loan. Thus, the payments, made in 1954, 1955 and 1956 came under Sections 301 and 316 of the Internal Revenue Code and were properly treated as dividend income.

### ORDER

r or the reasons appearing in the foregoing opinion, it is hereby

Adjudged and ordered that the plaintiffs' complaint be dismissed with prejudice and that the defendant recover its costs in this behalf expended, to which action and ruling of the Court the plaintiffs, by counsel, object and except.

2. There being a difference of $36,797.43 between the notes payable ($244,512.01) and the alleged distribution of income to the beneficiaries ($207,714.58), the Government allowed such difference to be treated as a loan to the estate, and thus properly deductible.

### APPENDIX

#### STIPULATION OF FACTS

The plaintiffs and the defendant stipulate and agree that the following are the facts in the case:

1. Jurisdiction of this action is conferred by Section 1346(a) (1) of Title 28, of the United States Code as amended.

2. Plaintiffs are citizens of the State of West Virginia, and of the United States of America, and reside at 509 Main Street, in the City of Logan, Logan County, State of West Virginia.

3. This action is one to recover income taxes assessed and collected for the calendar years of 1954, 1955, and 1956, from the plaintiffs, under the Internal Revenue laws of the United States, and is filed pursuant to authority conferred to sue by Section 1346(a) (1) of Title 28, of the United States Code as amended.

4. B. C. Harris died testate in the County of Logan, State of West Virginia, on the 11th day of February, 1948. His will was duly filed for probate before the County Court of Logan County, West Virginia.

5. In the course of the administration of the estate by the Executors, Lula M. Harris and R. H. Casto, of Logan, West Virginia, they continued to operate the business known as the Logan Mercentile

Company (not incorporated) and in due course filed Form Number 1041 with the Internal Revenue Service, for the years 1948, 1949, and 1950.

6. The trust reported distributions to the beneficiaries and these amounts were reported as income by the individuals in the following amounts:

| Beneficiary | 1948 | 1949 | 1950 | Total |
|---|---|---|---|---|
| Lula M. Harris | $ 29,806.29 | $11,024.21 | $ 712.42 | $ 41,542.92 |
| R. E. Harris | 59,612.59 | 22,048.40 | 1,424.84 | 83,085.83 |
| Carl Shelton | 59,612.59 | 22,048.40 | 1,424.84 | 83,085.83 |
| | $149,031.47 | $55,121.01 | $3,562.10 | $207,714.58 |

7. Upon final settlement of the estate, distributions in the form of stocks and bonds were made to the beneficiaries in the following amounts:

| Beneficiary | Stocks | Bonds | Total |
|---|---|---|---|
| Lula M. Harris | $11,323.87 | $69,000.00 | $ 80,323.87 |
| Robert Harris | 22,647.74 | 8,500.00 | 31,147.74 |
| Carl F. Shelton | 22,647.74 | 880.00 | 23,527.74 |
| | $56,619.35 | $78,380.00 | $134,999.35 |

8. Subsequent thereto, the said executors made a final settlement for the Honorable James E. Greever, Commissioner of Accounts of Logan County, West Virginia.

9. Pursuant to the terms of the last will and testament of B. C. Harris, deceased, the executors caused to be created Harris, Inc. This corporation commenced doing business on July 1, 1949.

10. The opening entry in the accounting records of Harris, Inc., on July 1, 1949, the date of incorporation, was as follows:

| | | |
|---|---|---|
| Total Assets | $331,584.84 | |
| Capital Stock (250 shares at $100 par) | | $ 25,000.00 |
| Paid-in or Capital Surplus | | 306,584.84 |
| | $331,584.84 | $331,584.84 |

11. On July 1, 1950, the following entry was made on the books of Harris, Inc.:

| | | |
|---|---|---|
| Surplus – Paid-In | | $244,512.01 |
| Mrs. Lula M. Harris | $146,334.85 | |
| R. E. Harris | 54,640.99 | |
| Carl F. Shelton | 43,536.17 | |

This entry made to repay advancements on Federal Estate and West Virginia Inheritance Taxes on the Estate of B. C. Harris.

| | | |
|---|---|---|
| Notes Payable | | $244,512.01 |

12. Plaintiffs filed for the calendar years 1954, 1955 and 1956, Form 1040 of the Internal Revenue Service, United States Individual Income Tax Return.

13. Subsequent to the filing of said tax returns, the Internal Revenue Service of the United States Treasury Department caused an audit to be made of the said returns, Forms 1040, of plaintiffs for the calendar years 1954, 1955 and 1956. As a result of said audit, the examining officer, on Form L-19, treated what was shown by the plaintiffs on the returns as interest received, plus amounts treated by the plaintiffs as principal payments on loans (and therefore not shown on the tax returns) from Harris, Inc., as unreported dividends.

14. As a result of said findings, plaintiffs filed a protest against the findings of the examining officer.

15. After plaintiffs had their hearing before the Appellate Division of the Internal Revenue Service of the United States Treasury Department, the District Director, P. L. Charles, On February 26, 1958, directed to plaintiffs an audit report for the taxable years ending December 31, 1954, 1955 and 1956. Subsequent thereto, on September 12, 1958, a letter was received by plaintiffs from Wilbur E. Myers, Associate Chief, Appellate Division, United States Treasury Department, Internal Revenue Service, containing a statement of a recomputation of tax.

16. The District Director of Internal Revenue for the United States Treasury Department's Internal Revenue Service forwarded to plaintiffs Form 17 of said department, "Statement of Income Tax Due" for each of the years 1954, 1955 and 1956. On February 9, 1959, plaintiffs paid to the Internal Revenue Service, as a result of said audit, the sum of $3,-221.30, which represents the determined tax due and interest thereon. Subsequent thereto, plaintiffs filed with the said United States Treasury Department's Internal Revenue Service, at the office of the District Director in Parkersburg, West Virginia, a Claim for Refund for the taxes and interest collected on the form provided by said office.

17. Subsequently, on June 16, 1959, the District Director of Internal Revenue notified plaintiffs that pursuant to the provisions of Section 6532(a) (1) of the Internal Revenue Code of 1954, their said claims for refund were disallowed in full.

18. The parties hereby stipulate as to the authenticity, admissibility, materiality and relevancy of the following exhibits attached to and made a part of plaintiffs' complaint:

Exhibit #1 through Exhibit #29

19. The parties hereby stipulate that the depositions of Dan W. Lassiter, Lula Harris and Robert Edwin Harris, all taken on the 27th day of February, 1964, may be received into evidence in this case as the testimony of such witnesses with the same force and effect as if given in open court.