[Civ. No. 32888.   Second Dist., Div. Two.   June 26, 1969.]

WRITERS GUILD OF AMERICA, WEST, INC., Plaintiff and Appellant, v. SCREEN GEMS, INC., et al., Defendants and Respondents.

368

Paul P. Selvin and Selvin & Cohen for Plaintiff and Appellant.

Mitchell, Silberberg & Knupp, Arthur Groman and Charles A. Collier, Jr., for Defendants and Respondents.

FLEMING, J.—Appeal by Writers Guild of America, West, Inc. (Guild) from the denial of its petition to compel arbitration. Guild sought an order for arbitration after its

application in the superior court for a preliminary injunction had been denied.

Guild's demand for arbitration arose from the following circumstances.

Guild, a labor union, negotiated a collective bargaining agreement (Basic Agreement) on behalf of its writer members with the producers of television programs. Disputes between Guild and the producers over the meaning of the terms in the Basic Agreement were made arbitrable. One of the terms of the Basic Agreement reserved to the writers the merchandising and publication rights to materials first described by the writers.

Mazursky and Tucker, writers, worked under contract for Screen Gems and Raybert, producers of the television series, "The Monkees." On 9 September 1966, the two writers, in a contract negotiated on their behalf by Guild, granted Screen Gems and Raybert for a specified consideration the series' merchandising and publication rights "reserved by the writer[s] under the terms and conditions . . . of the . . . Basic Agreement."

A dispute arose among the parties over the correct interpretation of this contract (the Raybert Contract), and on 19 January 1967, Guild, Mazursky, and Tucker jointly filed this suit in the superior court against Screen Gems and Raybert to rescind the Raybert Contract on the ground that at the time of its making the parties had no common understanding of the rights it granted. In their complaint Guild and the writers set forth at length their interpretation of the terms, merchandising and publication rights, used in the Basic Agreement and incorporated in the Raybert Contract. Guild and the writers also asked that "a preliminary and permanent injunction issue enjoining and restraining the defendants . . . from exercising any of the reserved rights of the writers in the television series, 'The Monkees' and . . . from exercising . . . merchandising rights and publication rights as defined above in this Complaint." Defendants answered the complaint and cross-complained against the writers for a declaration of the meaning of the terms, merchandising and publication rights, in the Raybert Contract.

On 14 February Guild and the writers brought their application for a preliminary injunction before the superior court, and after a hearing their application was denied.

Guild then demanded that Screen Gems and Raybert submit the dispute to arbitration, and on the latter's refusal

Guild petitioned the superior court to order arbitration. Thereafter, defendants amended their cross-complaint for declaratory relief to add Guild as a cross-defendant. On 17 April the petition for arbitration came before the superior court, and the court, finding that Guild had waived its right to compel arbitration, denied the petition.

Essentially, the questions before the court are whether Guild's suit sought a court interpretation of the meaning of the terms merchandising and publication rights in the Basic Agreement. If it did, could Guild later withdraw its request for a court interpretation and compel arbitration? If it could, how soon would Guild have to act in order not to lose its right to arbitration?

We start with the unquestioned fact that Guild's complaint directly asked the court to interpret the terms of the Raybert Contract, whose terms were defined by reference to the Basic Agreement. An interpretation of the former necessarily required a prior interpretation of the latter. Under the pleadings we have little doubt that a judgment between Guild and defendants interpreting the terms in the Basic Agreement as used in the Raybert Contract would, on principles of collateral estoppel, bind the parties on the meaning of those terms in other litigation. For example, in *Price* v. *Sixth Dist. Agricultural Assn.*, 201 Cal. 502, 509 [258 P. 387], a court interpretation of an earlier contract was held conclusive on the rights of the parties under a later contract with similar provisions. In *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co.*, 58 Cal.2d 601 [25 Cal.Rptr. 559, 375 P.2d 439], a judgment of criminal conviction for conspiracy to defraud an insurer estopped Teitelbaum in a subsequent civil suit from recovering on the insurance policy. In *Bernhard* v. *Bank of America*, 19 Cal.2d 807 [122 P.2d 892], a ruling against a claimant in a probate proceeding was held binding in a subsequent suit by the same claimant on the same claim against a bank. In *Partmar Corp.* v. *Paramount etc. Theatres Corp.*, 347 U.S. 89, 91 [98 L.Ed. 532, 537, 74 S.Ct. 414], Paramount contended that it could terminate its franchise agreement and theatre lease with Partmar because the franchise and lease violated the anti-trust laws. Partmar resisted termination, and the trial court, finding no anti-trust violation, gave judgment for Partmar. Thereafter, Partmar's counterclaim for treble damages under the anti-trust laws, which claim had been severed for trial, was dismissed by the trial court on the ground of collateral estoppel, because the earlier finding that the franchise and

lease did not violate the anti-trust laws had been essential to the earlier judgment for Partmar. The Supreme Court affirmed. At bench, the court would have to construe the Basic Agreement to decide the lawsuit, and since its construction would bind the parties in any subsequent litigation over the meaning of the terms of the Basic Agreement, it seems inescapable that Guild solicited a judicial adjudication of the meaning of the terms in the Basic Agreement. In so doing, it placed in jeopardy its right to compel arbitration on the same issue.

*Case* v. *Kadota Fig Assn.,* 35 Cal.2d 596 [220 P.2d 912], is directly in point, and for that reason we refer to it in some detail. Case-Swayne contracted to operate a cannery for Kadota, an association of fig growers. Under its contract Case-Swayne was allowed to pack other fruit and pay Kadota a percentage of the profits from such packing. Thereafter Case-Swayne contracted with Yosemite Growers to pack peaches. The Yosemite contract for peaches, but not the Kadota contract for figs, provided for arbitration of accounting disputes involving computation or allocation of cost. Differences arose between the parties, and Case-Swayne sued Kadota for breach of contract and Yosemite for inducing breach of Kadota's contract. Both growers' associations filed denials and counterclaims, Kadota pleading breach of contract by Case-Swayne and Yosemite seeking an accounting (a subject for arbitration under the Yosemite contract). The trial court gave judgment for Kadota and Yosemite on their counterclaims.

On appeal, Case-Swayne argued that the award to Yosemite should be vacated because Yosemite failed to submit the accounting to arbitration. In holding that Case-Swayne had waived arbitration the court said: ''Case-Swayne sued Yosemite alleging that it had wrongfully induced Kadota to breach its contract. One defense available to Yosemite under its general denial was that there had been no such breach. . . .

''. . . The issue presented by Case-Swayne in the action against Yosemite, therefore, inevitably included the question of performance by Kadota, and it could not be completely determined without ascertaining the amounts chargeable to Yosemite. The Kadota contract, by authorizing Case-Swayne to pack fruit other than figs, expressly contemplated contracts such as the Yosemite agreement, and the Yosemite agreement referred to the Kadota agreement by stating that Case-Swayne had the right to use the plant facilities. . . . Evidence tending to prove that it was Case-Swayne and not

Kadota which had breached the contract, at least in part also fixed the rights of Case-Swayne and Yosemite as to certain costs. Otherwise stated, the cause of action pleaded by Yosemite against Case-Swayne was inextricably linked with, and an essential part of, its defense upon the charge of inducing a breach of contract.

". . . *For these reasons, by resorting to litigation, Case-Swayne waived any right it might have had to require the selection of an accountant* to make a determination of any matter involving the 'computation or allocation of the costs' under its agreement with Yosemite. (*Jones* v. *Pollock,* 34 Cal. 2d 863, 867 [215 P.2d 733].)'" (35 Cal.2d at pp. 605-606; italics ours.) Thus a suit brought by a party (Case-Swayne) to one contract (the Kadota agreement) constituted a waiver of that party's right to arbitration under another contract (the Yosemite agreement) which was "inextricably linked" to the former contract. In similar fashion, when Guild sought an adjudication of the terms of the Raybert Contract it necessarily sought an interpretation of the identical terms in the Basic Agreement. Guild, by filing suit involving an arbitrable issue against parties with which it had an agrement to arbitrate, forced the latter to raise the arbitrable issue as a defense. (*Sutphin* v. *Speik,* 15 Cal.2d 195, 203 [99 P.2d 652, 101 P.2d 497].) This defendants did in their answer and cross-complaint for declaratory relief. Thus issue was joined among the parties on the interpretation of the terms of the Basic Agreement.

But although Guild raised a particular issue and issue was joined among the parties, was Guild thereby precluded from subsequently withdrawing its request for judicial interpretation and demanding arbitration? In analysing this question we find helpful section 581 of the Code of Civil Procedure, which governs withdrawal of suits by parties. Under that section a plaintiff may dismiss an action before trial, provided a counterclaim has not been set up nor affirmative relief sought on a cross-complaint or answer. After dismissal, a plaintiff may then file another suit in the same or a different court. (Witkin, Cal. Procedure (1954) pp. 1655, 1661-1662, 1940-1941.) While the right to file a second suit is not identical with the right to seek a subsequent arbitration (since the right to file suit is statutory and the right to compel arbitration is contractual), still the parallel suggests that some false starts and jockeying for position are tolerated in the starting gates of our legal racetracks. (Cf. *Simpson* v. *Superior Court,*

68 Cal.App.2d 821, 825 [158 P.2d 46].) Since a plaintiff who has filed an action on a particular issue and later dismissed it under section 581 can refile in the same or a different court, it seems logical to conclude that he can also refile in an arbitration tribunal. The analogy with procedure under section 581 seems particularly apt, when, as here, the disputed issue has entered the litigation derivatively and referentially as a consequence of its linkage with another issue. At the time Guild filed its motion to compel arbitration, neither counterclaim, nor cross-complaint, nor affirmative relief had been sought against it (as distinguished from the writers). Consequently, under the standard outlined in section 581 the litigation had not reached the point of no return. Since Guild could have dismissed its suit and filed a new action demanding arbitration, we conclude it could petition the court in the same suit to compel arbitration.

However, joinder of issue is not the only relevant factor in the case, for another item must be taken into account— Guild's application for a preliminary injunction. After Guild obtained a ruling on the preliminary injunction, the case no longer consisted merely of statements of the parties' contentions but contained the added element of a preliminary ruling on a critical aspect of the litigation. When Guild and the writers sought injunctive relief to prohibit defendants from exercising merchandising and publication rights under the Raybert Contract, rights defined by reference to the Basic Agreement, they solicited an injunction which could not have been framed until the terms of the basic Agreement had been interpreted. Therefore, joinder by Guild of the writers' prayer for injunctive relief amounted in effect to a request for an immediate interpretation by the superior court of the disputed terms in the Basic Agreement. The legal importance of the ruling on the preliminary injunction is reflected in its status as an appealable order. (Code Civ. Proc., § 904.1, subd. (f).) The practical importance of the ruling lies in the ephemeral nature of intanglible rights in the entertainment industry. In a suit involving such rights a ruling on a provisional remedy may cause the parties to compose their differences in order to proceed with an immediate exploitation of rights whose commercial value may not await the final outcome of litigation. We conclude that once Guild had obtained a ruling from the superior court on a preliminary injunction, it could no longer unilaterally withdraw its request for court interpretation of the Basic Agreement and transfer the con-

troversy to the different tribunal provided under arbitration. In pressing the issue to the extent it did, Guild waived its contract right to arbitration. (Code Civ. Proc., § 1281.2, subd. (a) ; cf. *Trubowitch* v. *Riverbank Canning Co.*, 30 Cal.2d 335, 339 [182 P.2d 182; *Local 659, I.A.T.S.E.* v. *Color Corp. of America*, 47 Cal.2d 189, 194-195 [302 P.2d 294] ; *Brunzell Constr. Co.* v. *Harrah's Club*, 253 Cal.App.2d 764, 779 [62 Cal.Rptr. 505].)

Guild argues that its solicitation of a provisional remedy from the court should not interfere with its right to secure a determination on the merits in arbitration. On this point we note, first, that provisional injunctive relief would have been available to Guild in arbitration under the terms of its arbitration contract, and, second, that Guild's court action sought a permanent, as well as a preliminary, injunction, a demand at odds with its present suggestion that it sought only provisional relief from the court. The cases on which Guild relies for the proposition that solicitation of temporary relief from one tribunal does not bar a subsequent action on the merits in another tribunal—*Schwartz* v. *Leibel*, 249 Cal.App.2d 761 [57 Cal.Rptr. 831] ; *Ross* v. *Blanchard*, 251 Cal.App.2d 739 [59 Cal.Rptr. 783] ; *Homestead Sav. & Loan Assn.* v. *Superior Court*, 195 Cal.App.2d 697 [16 Cal.Rptr. 121]—are inapposite, for in each of them the provisional remedy sought in court was not available in arbitration. In *Ross* the petitioner secured an attachment from the court; in *Homestead* the petitioner took action to foreclose a mechanics' lien; in *Schwartz* the petitioner sought injunctive relief which under the arbitration contract in that case the arbitrator was powerless to grant. None of these petitioners put itself in the position of demanding, serially, identical relief from different tribunals.

■ Finally, Guild argues that it was an indispensable party to a suit under the Raybert Contract; that because of this indispensability it was required to join the writers' suit and therefore cannot be said to have waived its right to arbitration by having voluntarily sought court adjudication. Guild's claim to indispensability is based, primarily, on the fact that it was a negotiator and a signer of the Raybert Contract, and, secondarily, on the happenstance that the writers' checks and accounting statements were deliverable at Guild's office. Neither of these circumstances compelled Guild to join as a party to the suit. ■ An agent is not an indispensable party in litigation between his principal and a third party over the subject matter of the agency. (*Churchill* v.

*Woodworth,* 148 Cal. 669, 672 [84 P. 155, 113 Am.St.Rep. 324]; *Muggill* v. *Reuben H. Donnelley Corp.,* 62 Cal.2d 239, 241 [42 Cal.Rptr. 107, 398 P.2d 147].) Nor need the mechanics of payment and accounting affect the substantive rights of the principals to the contract. ■ Essentially, an indispensable party is one whose absence will prevent a court from rendering any effective judgment between the parties. (Code Civ. Proc., § 389.) ■ At bench, the writers alone could have secured an effective judgment against Screen Gems and Raybert, and Screen Gems and Raybert could have secured an effective judgment against the writers. In neither instance would the presence of Guild have been required.

■ What the case boils down to is that Guild joined the suit as plaintiff in order to establish its interpretation of the Basic Agreement as the correct one. It solicited immediate relief from the superior court in the form of a preliminary injunction. When its application for a preliminary injunction was turned down, it then attempted to litigate the same issue before the different tribunal called for under arbitration. This it cannot do, for having sought recourse in the superior court and obtained a ruling from that court on a matter of importance, it could be required by its adversaries to continue in that forum. If dissatisfied with the denial of its application for a preliminary injunction, it should have appealed the denial to this court, not to the arbitration tribunal. ■ As stated in *Morris Shoenthal, Inc.* v. *Gaynor Junior Dresses, Inc.,* 142 N.Y.S.2d 849, 851: "To permit a party to proceed with an action until an unfavorable decision on a motion is rendered and then allow it to resort, against the wishes of the adversary, to arbitration, where a better result is hoped for, would cause an unnecessary waste of time and effort to all concerned and is a fundamentally unfair procedure which should not be encouraged." In sporting terminology, Guild, having been called out on strikes in the first inning, is not entitled to move the ball game across the street and start over again.

The order is affirmed.

Roth, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied July 23, 1969, and appellant's petition for a hearing by the Supreme Court was denied August 20, 1969. Mosk, J., did not participate therein.