[No. B039234. Second Dist., Div. Three. May 17, 1991.]

SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE OF GREATER LOS ANGELES et al., Plaintiffs and Respondents, v. AL MALAIKAH AUDITORIUM COMPANY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

## COUNSEL

Joseph W. Fairfield for Defendant and Appellant.

Cooper, Epstein & Hurewitz, Carl Grumer and Jeffrey C. Walker for Plaintiffs and Respondents.

**OPINION**

**HINZ, J.—**

### INTRODUCTION

In this case an auditorium accepted a deposit from a concert producer to reserve the auditorium on a specific date. Before a lease was executed, the auditorium received a more lucrative offer from another prospective tenant for that date, canceled the concert producer's reservation, and returned the deposit. In the published portion of the opinion, we affirm a jury's finding that in such circumstances the auditorium breached a contract with the concert producer. We also affirm the trial court's award of Code of Civil Procedure section 128.5 sanctions against defendant. In an unpublished portion of the opinion we consider and reject defendant auditorium's remaining contentions of error.

On November 9, 1983, plaintiffs, the Southern Christian Leadership Conference of Greater Los Angeles (SCLC) and The Foundation for New American Music, Inc. (FNAM or the Foundation) filed a complaint for anticipatory breach of contract, specific performance, temporary restraining order, preliminary injunction, and permanent injunction against defendant Al Malaikah Auditorium Company (doing business as Shrine Auditorium Co.) and 10 unnamed defendants. The complaint arose from a contract by FNAM to lease the Shrine Auditorium on January 13, 1984, for a concert.

On December 9, 1983, the trial court issued a preliminary injunction against defendants to restrain and enjoin them from using or allowing any person or entity other than plaintiffs to use the Shrine Civic Auditorium on January 13, 1984. By stipulation of both parties, the trial court filed an order to dissolve and vacate the preliminary injunction on December 23, 1983.

After the trial court sustained two demurrers with leave to amend, plaintiffs filed first and second amended complaints for anticipatory breach of contract. On October 21, 1985, defendant Al Malaikah Auditorium Company moved for order adjudicating issues and summary judgment. On November 21, 1985, the trial court denied the summary judgment motion, granted summary adjudication of four undisputed issues, and denied the summary adjudication of remaining substantially controverted issues.

Plaintiffs filed a third amended complaint for anticipatory breach of contract and for tortious denial of the existence of a contract on February 7, 1986.

After both sides rested, out of the jury's hearing, the trial court denied plaintiffs' and defendant's motions for a directed verdict. On September 28, 1988, the jury returned a verdict finding for plaintiffs and against defendant on the breach of contract action, assessing compensatory damages against Al Malaikah Auditorium Company of $100,000; on the second cause of action for bad faith denial of the contract, the jury found for the plaintiffs and assessed exemplary damages against defendant Al Malaikah Auditorium Company of $25,000. Pursuant to Code of Civil Procedure section 128.5, on November 28, 1988, the trial court ordered defendant to pay plaintiffs $27,905.00 sanctions.

A notice of entry of judgment was filed October 18, 1988. On December 14, 1988, the trial court denied defendant's motions for judgment notwithstanding the verdict or alternatively for a new trial.

Defendant Al Malaikah Auditorium Company filed a notice of appeal on December 27, 1988.

## FACTS

Jack Elliott, president and music director of the FNAM and a composer and conductor, produced about 30 musical concerts since the Foundation began in 1979. Formed to raise funds to commission American, jazz-based symphonic music, the Foundation also supports the New American Orchestra to perform commissioned works.

The Foundation desired to produce a concert during Martin Luther King Week in 1984. Because concerts honoring King had sold out the Music Center the previous year, it was decided to move the 1984 event to the Shrine Auditorium, a larger hall.

Elliott talked with Mark Ridley-Thomas, head of the SCLC, about the SCLC's cosponsoring the event. In May 1983, the Foundation sent a letter to Oakerson of the Shrine Auditorium and a $1,000 deposit to reserve the hall for January 13, 1984. The Shrine Auditorium cashed the check and provided a receipt to hold the January 13, 1984, date.

In 1981 or 1982, Elliott had met Oakerson (the Shrine Auditorium manager), decided on a concert date, and given the Shrine a check to reserve the date. When it was later unable to obtain sponsorship for the concert, the Foundation forfeited the $500 deposit.

Before that earlier concert, the Shrine had sent Elliott a lease and also a document setting forth terms, conditions, labor costs, and other information.

Elliott had dealt with the Music Center, Royce Hall, Carnegie Hall, Avery Fisher Hall, the Kennedy Center, and other major venues. He testified that leasing a concert hall requires an estimate of labor and other costs. The management of a hall prepares a cost estimate based on information provided by FNAM.

Elliott identified a cost estimate for a January 15, 1982, concert that the Shrine had prepared. He had often been involved with companies producing concerts at the Shrine, although he himself negotiated with the Shrine management only twice, for a 1982 and for a 1983 concert, neither of which materialized. Elliott felt his experience with the Shrine made him familiar with its standard rental terms.

In May 1983, Elliott knew the Shrine lease term regarding rental fees of 10 percent of gross ticket sales with a $2,500 minimum. He was also familiar with the term that states (on exhibit 102) that "[a]s soon as you have definitive show information and have selected a date clear on our calendar, send us a $1,000 good faith deposit . . . to hold your date while we are obtaining your cost estimates and preparing your lease," and understood that the Shrine would prepare the cost estimates and lease.

Elliott was also familiar with the sentences stating that "[t]his deposit is only a preliminary deposit to hold the date. It will be applied to your final cost statement along with your event deposit, which is based on your cost estimate, and is taken at the time contracts are signed. . . . This preliminary deposit is not a guarantee of lease." Costs for sets and electrical, sound, and stage employees were based on union scale, which might have changed from two years earlier.

In Elliott's experience, cost estimates could be received two to three months before the concert, but that would be early; sometimes cost estimates arrived after the concert. He never recalled receiving a cost estimate more than three months before a concert. Nobody from the Shrine in 1983 contacted him to prepare a cost estimate, but the auditorium could obtain information about a cost estimate from the Foundation or from information submitted in connection with the 1982 concert. When he reserved the date, he said the concert would be the same concert that had been discussed before.

Elliott understood that FNAM would forfeit the $1,000 deposit if it did not produce a concert, as had happened in 1982. Elliott understood that "the acceptance of the involvement of a hall" means that it holds and guarantees the date. Acceptance of the deposit means that the lease would be

forthcoming on the auditorium's standard terms. After the Shrine accepted the deposit, Elliott began to book the concert, secure sponsorship, and enlist support of artists. The Foundation obtained a guaranty from Dionne Warwick, Wally Amos, and Grover Washington, Jr., to perform. Elliott also obtained approval of the Foundation's executive board of the plans and the SCLC's cosponsorship. FNAM prepared graphics to announce the concert, and passed information to people in the industry that the concert would be held.

Elliott met with the SCLC and spoke to the principal at a Los Angeles high school to enlist people to work and do a rehearsal. For community involvement, the Foundation invites people who cannot purchase tickets to a free dress rehearsal. Elliott confirmed that FNAM would pay union scale for ushers at the dress rehearsal.

In July 1983, Elliott received a telephone call from Jim Oakerson, who asked if the Foundation could move its date. Oakerson said the Shrine might have another tenant, and it would help the auditorium if the Foundation could change its date. Elliott said he would investigate, but discovered that moving the date would lose Grover Washington, Jr., and Dionne Warwick. Most importantly it would mean the concert would not occur during Martin Luther King Week. The SCLC made it clear that the concert would not be as effective if the date was changed. Elliott informed Oakerson that FNAM could not move the date.

Elliott testified that his conversation with Oakerson, in which Oakerson asked the Foundation to move the concert date, amounted to an acknowledgement by the Shrine Auditorium that they had an agreement that FNAM would use the auditorium on that date.

Elliott wrote an August 10, 1983, letter telling Oakerson that rescheduling would jeopardize the concert. Elliott had not yet received a lease. In their previous conversation, Oakerson had not mentioned the cost estimate.

Elliott identified a September 15, 1983, letter to Oakerson informing him that the Foundation was finalizing the upcoming concert season and requesting a rental agreement for the January 13, 1984, concert for Elliott's signature. Oakerson never sent the rental agreement, and did not respond except to return the deposit. Oakerson's October 3, 1983, letter stated: "Enclosed please find your deposit check for $1,000, as we will be unable to do your show on the 13th of January, 1984. Please accept my apology as we've booked the entire month for the television show. [¶] If I can help you with

another date, please call me in my office." Enclosed was a Shrine Auditorium check for $1,000.

Elliott stated that during the previous October, the chances of moving the January 13, 1984, concert elsewhere were "practically nil," as FNAM needed a 6,000-seat hall. The only other such venue in Los Angeles is the Universal Amphitheater, which was wrong for this concert. Elliott investigated several other halls, but they were too small. The concert never occurred.

Elliott prepared an estimate (exhibit 117) of money lost because the concert did not occur. It includes income from ticket sales, a postconcert reception, souvenir programs, and contributions. The estimate also contains a fee for performing the same concert the next day in Palm Springs for the Assault on Literacy organization, which offered Elliott's organization a $30,000 fee. The document also estimates concert costs, including salaries, rehearsals, hall costs, cartage and musical instrument rental, music copying and reservation, guest travel and expenses, advertising and publicity, and a sum for a dress rehearsal.

FNAM itself would have priced auditorium seats. The Foundation estimated the following amounts: $109,100.50 ticket sales; $25,000 postconcert reception; $10,000 souvenir ad book; $7,500 contributions; and $30,000 fee for Palm Springs concert, for a subtotal of $249,111.50. Concert costs were estimated at $61,000. FNAM and SCLC would divide concert proceeds equally. No agreement was reached as to division of proceeds from this lawsuit in lieu of profits, but Elliott testified that the Foundation and SCLC "are partners, period."

Elliott identified his signature, on behalf of FNAM, on an assignment stating: "The undersigned hereby assigns to the Southern Christian Leadership Conference of Greater Los Angeles an undivided one-half interest in the claim of the undersigned against the Al Malaikah Auditorium Company arising from failure of Al Malaikah to lease the auditorium to the undersigned and/or the Southern California Leadership Conference on January 13, 1984. Assignment is made without recourse or warranty." In December 1983 the Shrine Auditorium paid $15,000 for the Foundation to vacate the injunction and release the concert date.

Elliott stated he did not agree to settle the entire case, and nobody asked Elliott to agree to that. He viewed the payment in exchange for vacating the injunction as "a part of the overall strategy that we had instituted to get ourselves made whole as a result of the actions of the Shrine."

James F. Oakerson testified that in May 1983, he managed the Shrine Auditorium, met clients, wrote up cost sheets, and prepared and signed leases. He determined whether to lease for concerts, and did not consult anyone else. The Shrine used a form contract (exhibit 101) for auditorium rentals.

Oakerson defined a deposit as something "to tie up the date until we can get together and work up a cost sheet." The cost sheet prepared figures to put in the contract. When the Shrine receives a deposit, it customarily sends a receipt and marks a date reserved in a date book. The standard rental rate in 1983 was $2,500 or 10 percent of gross ticket sales, whichever was greater.

Oakerson testified that if there is time to rerent the auditorium when it receives notice, he will refund the deposit. At deposition, however, he stated that if he rents the hall after somebody cancels, he will return the deposit, but will not return the deposit if he is not able to rent it to someone else. He confirmed that on a previous occasion, the Foundation had to cancel and lost their deposit.

A lease information sheet (exhibit 102) was given to potential customers or anyone who inquired about renting the Shrine. Oakerson did nothing to obtain cost estimates from FNAM for the 1984 concert, but stated that "without a cost sheet, there is no contract."

ABC Television contacted Oakerson about leasing the Shrine; one of the dates ABC wanted was the January 13, 1984, date that FNAM had reserved. Oakerson asked Elliott to move the date, but Elliott said he could not change it. Oakerson confirmed that on September 30, 1983, he sent a letter to ABC telling them he had reserved January 13, 1984, for their show, the American Music Awards, and that on October 3, 1983, he sent back the deposit to the Foundation. The letter states that the Shrine booked the entire month for the ABC show, but says nothing about FNAM's inability to secure funding. Oakerson had not asked about FNAM's ability to get funding.

Oakerson's interoffice memo instructing the bookkeeper to issue a check refunding the Foundation's $1,000 deposit does not mention a lack of funding. Oakerson decided to give the date to ABC and cancel FNAM's date. Oakerson did not recall whether, before cancelling the date, he asked the Foundation if it still wanted to produce the concert.

Oakerson did not consider the auditorium bound by contract unless he had a signed lease. He acknowledged, however, that on November 28, 1983,

Oakerson signed a declaration in opposition to a motion for preliminary injunction (exhibit 116) that stated in part: "But as Exhibit D annexed to Mr. Elliot's [sic] declaration clearly states, the date of January 13, 1984, has already been booked. Thus it is not a question of maintaining the status quo but of asking this court to enter an order directing defendant to cancel its valid contract now in existence between American Music Awards and Al Malaikah Auditorium and thus subject Al Malaikah Auditorium to lawsuit by American Music Awards for breach of contract."

At trial, however, Oakerson stated he did not know if he believed that on November 28, 1983, the Shrine had a valid contract with the American Music Awards. He did not know if the contract with the American Music Awards was signed before or after he signed the declaration.

Oakerson identified exhibit 118, "Contract of Lease of Shrine Auditorium Dated December 26th, 1983, between Al Malaikah Auditorium Company and American Broadcasting Company," as the contract by which ABC rented the Shrine for the 1984 American Music Awards. Oakerson signed the lease contract. Oakerson testified that he was not aware that the contract with ABC was not signed when he made his declaration, or else he would not have made the declaration. Although his declaration stated that a signed agreement was necessary to be binding, he had no signed agreement with ABC when he made his declaration.

Oakerson confirmed that the Shrine Auditorium would make more money from the 13-day lease with ABC Television than in a one-day lease to the Foundation.

Oakerson testified that despite his declaration that there is no standard rental rate for the auditorium, the rental rate is always a flat rate ($2,500 in 1983) or 10 percent of gross ticket sales, whichever is higher. Costs, however, varied a great deal from concert to concert.

Mark Ridley-Thomas, executive director of SCLC of Greater Los Angeles, testified that his organization is involved in civil rights, human rights, and social services. As the local chapter of a national organization founded by Dr. Martin Luther King, Jr., it has been principal sponsor of Martin Luther King Week in Los Angeles. SCLC is funded through membership, private, corporate, and public support.

In January 1983, Ridley-Thomas discussed cosponsorship of a concert during 1984 King Week with Jack Elliott. They agreed to cosponsor the event and that their organizations would split concert proceeds 50-50. The

SCLC budgeted a little less than $60,000 for King Week events. If it had needed more money for King Week programs, the SCLC would have contacted its corporate sponsors. Ridley-Thomas favored cosponsoring the King Festival because it would reach an audience that might not attend other events (such as an interfaith prayer breakfast, a black-tie dinner, and an art and essay contest) and would also help raise funds for the SCLC.

The SCLC knew that FNAM had made a deposit, and the SCLC understood that it would seek corporate support to pay for expenses. Ridley-Thomas and Elliott agreed that corporate support was necessary for the project, and that both organizations would work toward obtaining it. The SCLC put up no money in the venture, but there was not yet any need for it to do so. Even though the SCLC received no bills, its staff spent time working on the project. Since the SCLC pays employee salaries, such time constituted an SCLC expense.

Kenneth H. Boucher, recording secretary and custodian of books and records for the Al Malaikah Auditorium Company, testified that the company's certified public accountants are Davadue and Mini, which audits the books and prepares financial statements. Boucher confirmed that the net worth of Al Malaikah Auditorium Company increased from $3.4 million in 1983 to $3.859 million in 1987.

Gordon Hill Jenkins, Jr., testified for the defense. As booking manager for the Music Center Operating Company, Jenkins defined a cost estimate as an estimate of expenses that will become a part of a lease agreement with a prospective tenant. If a customer pays a deposit, a hall confirms that the deposit reserved the date, and the customer could not move the date after the hall received a more lucrative offer, it would not conform either to industry ethics or to Music Center procedures for the hall to return the deposit and cancel the booking three and a half months before the event.

Without communicating with the prospective tenant who had made a deposit but not yet signed a contract, Jenkins would not lease an auditorium to someone else. Jenkins testified, however, that reservation of the date does not guarantee a lease. Jenkins noted that the Music Center application states "[t]his application does not constitute an agreement between the parties," even though in the normal course of business if an application and deposit are taken, a lease normally follows. If Jenkins had not received cost estimate information three and a half months before the concert, he would not cancel the booking, but would contact the customer about a cost estimate, since there are situations in which a cost estimate is not practical that far in advance.

ISSUES

Defendant on appeal claims that:

1. FNAM and Al Malaikah Auditorium Company did not enter into a binding contract to lease the Shrine Auditorium for a January 13, 1984, concert;

2. The election of remedies doctrine estops plaintiffs from pursuing their breach of contract action;

3. Because exhibit 117 is inadmissible hearsay, the trial court erroneously admitted it into evidence and erroneously permitted a witness to testify as to its contents;

4. The trial court erroneously allowed Jack Elliott to testify as to damages;

5. The existence and interpretation of the contract is a question of law for the court and not a question of fact for the jury;

6. No *Seaman's Direct* tort was involved, and defendant was entitled to a judgment on the second cause of action for bad faith denial of the existence of a contract; and

7. The trial court erroneously imposed sanctions on Al Malaikah Auditorium Company.

DISCUSSION

I.

Defendant initially claims on appeal that FNAM and Al Malaikah Auditorium Company did not enter into a binding contract to lease the Shrine Auditorium.

Defendant argues that the construction of a contract is a judicial function, citing Code of Civil Procedure section 1858. That section, however, governs interpretation of a written contract or instrument. It states only that a court must simply ascertain and declare what the writing contains, neither inserting what has been omitted or omitting what has been inserted, and if the writing has several provisions or particulars, giving effect to all of them if possible.

The case at bench presents a different situation. ■ Where the lack of a written instrument reflecting every term of the agreement creates the dispute, the trier of fact must rely on extrinsic evidence to determine whether a contract existed and if so what it covered. Where it turns on the credibility of extrinsic evidence, interpretation of a contract is not a question of law but one of fact. (*LaCount v. Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754, 770 [145 Cal.Rptr. 244].)

We therefore reject a second aspect of defendant's argument, which is that the interpretation of a written instrument presents a question of law to be decided de novo by an appellate court. In *Broffman v. Newman* (1989) 213 Cal.App.3d 252, 257 [261 Cal.Rptr. 532], cited by defendants for this proposition, the extrinsic evidence admitted and considered in addition to a written partnership agreement was not in conflict, was not substantial, or was inconsistent with the only interpretation to which the instrument is reasonably susceptible. Under such circumstances *Broffman* concluded that interpretation of the agreement was a question of law.

That rule, however, only applies in the absence of conflicting extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Edmond's of Fresno v. MacDonald Group, Ltd.* (1985) 171 Cal.App.3d 598, 603 [217 Cal.Rptr. 375].) In the case at bench the written evidence of the contract was fragmentary and the extrinsic evidence created serious conflict, was not insubstantial, and gave rise to differing interpretations. It thus presented an issue for the trier of fact to resolve. "The proper interpretation of the parties' written agreement turns not only on the language of the agreement but on the proper resolution of conflicting extrinsic evidence and upon an evaluation of witness credibility. In these circumstances, we are bound by the trial court's construction of the agreement if it is reasonably susceptible to that interpretation. [Citations.]" (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 134 [135 Cal.Rptr. 802].)

■ The evidence presented to the trier of fact included several documents: A May 27, 1983, letter from Elliott to Oakerson enclosing a $1,000 deposit to hold the date of January 13, 1984 (exhibit 104); FNAM's check for $1,000 dated May 27, 1983 (exhibit 105); the Shrine Auditorium Company's June 3, 1983, receipt for "$1,000.00 deposit received to hold the date of January 13, 1984 for the New American Music Show" (exhibit 106); and an unexecuted form contract of lease of the Shrine Auditorium and "Shrine Auditorium & Exposition Hall Lease Information" (exhibits 101 and 102). The trier of fact also heard testimony from Elliott and Oakerson, the

principals of their respective organizations, that supplied contradictory evidence about what these documents represented.

The jury's verdict resolved this conflicting evidence in plaintiffs' favor. If its determination is reasonable and supported by substantial evidence, we will not overturn the determination of the trier of fact. (*Central Bank* v. *Kaiperm Santa Clara Fed. Credit Union* (1987) 191 Cal.App.3d 186, 203 [236 Cal.Rptr. 262].)

Defendant argues that the law and facts of *Beck* v. *American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555 [260 Cal.Rptr. 237] apply to the case at bench. *Beck* affirmed a judgment sustaining a demurrer and dismissing a complaint to which the plaintiff had merely attached and incorporated a writing without alleging that it was ambiguous and without alleging plaintiff's interpretation. Citing principles governing a trial court's review of a writing in ruling on a demurrer, the *Beck* opinion stated that the rule applicable on demurrer is ". . . 'simply a variation on the well-recognized theme that " 'It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' ". . .' " (*Id.*, at p. 1561, citations omitted.) The case at bench did not come before this court following a sustaining of a demurrer, but after a jury trial. More importantly, unlike *Beck* the case at bench *did* turn upon the credibility of extrinsic evidence.

Nor does the discussion of substantive law in *Beck* apply to the case at bench. The jury found that the transaction between the FNAM and the Shrine Auditorium was a binding contract, and not merely, as in *Beck*, " 'an agreement to agree.' " (211 Cal.App.3d at p. 1563.) The transaction between FNAM and the Shrine Auditorium resembles an option contract, " 'a contract to keep an offer open.' " (1 Williston on Contracts (3d ed. 1957) § 614, p. 198.) An option agreement is a contract distinct from the contract to which the option relates. (*T. M. Cobb Co.* v. *Superior Court* (1984) 36 Cal.3d 273, 282 [204 Cal.Rptr. 143, 682 P.2d 338].)

In the case at bench, the Shrine, the optionor, was bound not to execute a lease to someone else for the date FNAM had reserved; it gave the option by selling the right to the date for consideration. FNAM, the optionee, purchased the right to accept an offer of a lease for a specified date by completing a lease contract; it held the right to the date, and would exercise its option by completing a lease contract.

FNAM did not supply, and the Shrine Auditorium did not request, cost estimates and further information necessary to execute a written lease. But

the jury heard evidence that such information customarily did not arrive until two or three months before the concert date, and in some instances actually followed a concert. When the Shrine Auditorium returned the deposit on October 3, 1983, more than three months remained before the concert date that FNAM had reserved. If the agreement is silent as to the period of the option, it must be exercised within a reasonable time under the circumstances. (*Santa Clara Properties Co.* v. *R. L. C., Inc.* (1963) 217 Cal.App.2d 840, 854 [32 Cal.Rptr. 333].)

In an option contract, the optionor (here, the Shrine Auditorium) waives the right to revoke the offer (here, the offer to lease the auditorium on the date FNAM reserved). (*Warner Bros. Pictures* v. *Brodel* (1948) 31 Cal.2d 766 772 [192 P.2d 949, 3 A.L.R.2d 691]; see also *Palo Alto Town & Country Village, Inc.* v. *BBTC Company* (1974) 11 Cal.3d 494, 502-503 [113 Cal.Rptr. 705, 521 P.2d 1097].) To paraphrase *Warner Bros. Pictures* v. *Brodel, supra*, 31 Cal.2d at page 772, an option contract relating to the lease of land is not a lease of property, but a sale of the right to lease. Even though the optionee (FNAM) incurs no liability with regard to the contract or conveyance for which it holds an option, the optionor (the Shrine) promises, upon the exercise of the option, to perform the contract. (*Ibid.*) That the terms of the lease remained unspecified and the lease unexecuted does not invalidate FNAM's right to what it had already purchased; there was evidence that such amounts were frequently left unspecified until a period much closer to the contract date, and moreover were known by both parties according to standard industry rates.

The *Brodel* opinion establishes the basis for liability as follows: ". . . [T]he option contract gives the optionee a right against the optionor for performance of the contract to which the option relates upon the exercise of the option, which the optionor cannot defeat by repudiating the option. [Citations.]" (31 Cal.2d at p. 773.) By returning the deposit and renting the auditorium to someone else, the Shrine Auditorium repudiated the option and breached its contract.

## II.

■ Defendant on appeal next claims that the election of remedies doctrine estops plaintiffs from pursuing their breach of contract action. The initial complaint contained causes of action for breach of contract and for specific performance, which defendant argues are inconsistent remedies. Since plaintiffs elected to seek relief based on specific performance and obtained a preliminary injunction to defendant's injury, defendant urges that

plaintiffs should not have been permitted to proceed to trial for damages based on anticipatory breach of contract.

■ A party should be entitled to change alternative remedies until satisfaction of judgment, or application of res judicata or estoppel, vindicates one of the inconsistent rights. (*Frazier* v. *Metropolitan Life Ins. Co.* (1985) 169 Cal.App.3d 90, 101 [214 Cal.Rptr. 883].) The election of remedies doctrine states that accepting an actual benefit from an alternative theory that renders continued pursuit of the alternative unfair constitutes an election. (*Perry* v. *Robertson* (1988) 201 Cal.App.3d 333, 341 [247 Cal.Rptr. 74].)

■ If the main action seeks another remedy, a preliminary injunction simply forms a provisional or auxiliary remedy to preserve the status quo until a final judgment. ■ The grant or denial of a preliminary injunction does not adjudicate the ultimate rights in controversy. Instead, it merely reflects the court's determination, after balancing the respective parties' equities, that pending a trial on the merits the defendant should or should not be restrained from exercising a right claimed by that defendant. (*Jeneski* v. *Myers* (1984) 163 Cal.App.3d 18, 28 [209 Cal.Rptr. 178], cert. den. *sub. nom. Kizer* v. *Jeneski* (1985) 471 U.S. 1136 [86 L.Ed.2d 695, 105 S.Ct. 2677].) A preliminary injunction does not create a right, but merely undertakes to protect a right from unlawful or injurious interference. (*M Restaurants, Inc.* v. *San Francisco Local Joint Exec. Bd. Culinary etc. Union* (1981) 124 Cal.App.3d 666, 674 [177 Cal.Rptr. 690].) The fate of a preliminary injunction, having a strictly adjunct character, depends on the main action. (*City of Oakland* v. *Superior Court* (1982) 136 Cal.App.3d 565, 569 [186 Cal.Rptr. 326].)

■ Plaintiffs are not required to wait until they suffer actual harm, but may seek injunctive relief against threatened infringement of their rights. (*Maria P.* v. *Riles* (1987) 43 Cal.3d 1281, 1292 [240 Cal.Rptr. 872, 743 P.2d 932].) ■ In ruling on a preliminary injunction, the court considers whether a greater injury will result to the defendant from granting the injunction than to the plaintiff from refusing it. The trial court considers the probability of the plaintiff's ultimately prevailing in a trial on the merits, and will deny a preliminary injunction unless there is a reasonable probability that plaintiff will successfully assert his rights. " '. . . [T]he granting or denial of a preliminary injunction on a verified complaint, together with oral testimony or affidavits, even though the evidence with respect to the absolute right therefor may be conflicting, rests in the sound discretion of the trial court, and that the order may not be interfered with on appeal, except

for an abuse of discretion.' [Citations.]" (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527-528 [67 Cal.Rptr. 761, 439 P.2d 889].)

 Thus, the fact that the main action was for breach of contract did not preclude the trial court from issuing a preliminary injunction. Defendant cites *Writers Guild of America, West, Inc.* v. *Screen Gems, Inc.* (1969) 274 Cal.App.2d 367 [79 Cal.Rptr. 208], in which plaintiffs (television writers and their labor union) sued defendant producers to interpret contractual provisions, and moved for a preliminary injunction restraining defendants from exercising rights arising from the disputed provisions. The trial court denied the motion and plaintiffs' later petition to submit the dispute to arbitration.

On appeal, *Writers Guild of America, West, Inc., supra,* held that by filing suit involving an arbitrable issue against parties with whom they agreed to arbitrate, plaintiffs forced defendants to raise the arbitrable issue as a defense. A motion seeking injunctive relief required the trial court to interpret the disputed contractual terms. Having obtained contractual interpretation by means of a preliminary injunction, plaintiffs waived their right to remove the case to an arbitrator or to some other forum. (274 Cal.App.2d at pp. 373-375.)

The case at bench does not involve plaintiff's attempt to remove the case from superior court for rehearing before an arbitrator or in any other forum. *Writers Guild* thus does not govern the case at bench.

Defendant also argues that issuance of the preliminary injunction exceeded the trial court's jurisdiction, since an injunction cannot be granted to prevent the breach of a contract. For this proposition defendant cites Code of Civil Procedure, section 526, subdivision 5. That section, however, states only that an injunction cannot be granted "[t]o prevent the breach of a contract . . . the performance of which would not be specifically enforced . . . ." In the case at bench, however, the contract could have been specifically enforced, even though in fact it was not. Since a court may specifically enforce a lease (*Vincent* v. *Grayson* (1973) 30 Cal.App.3d 899, 912 [106 Cal.Rptr. 733]), it was not improper in the case at bench for this preliminary injunction to issue.

Defendant also argues that having established the right to hold a concert in the Shrine Auditorium on January 13, 1984, by obtaining injunctive relief, under the primary rights theory plaintiffs no longer had a claim for damages. There was evidence, however, that plaintiffs did not agree at that time to settle the entire case. The record on appeal does not contain the stipulation, whose text would be necessary to determine whether the parties

contemplated that a payment by defendants settled all plaintiffs' claims. The trial court found otherwise, and to that determination we must necessarily defer.

We conclude that the election of remedies doctrine does not apply to the case at bench.

## III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## V.

 Defendant claims on appeal that the trial court erroneously awarded sanctions pursuant to Code of Civil Procedure section 128.5. Citing *Garcia v. Sterling* (1985) 176 Cal.App.3d 17, 23 [221 Cal.Rptr. 349], defendant argues that the order imposing the award lacks details, consists of statements of conclusory terms, and thus does not meet the requirements of section 128.5.

 Code of Civil Procedure section 128.5 permits a trial court to order payment of reasonable expenses, including attorney's fees, incurred by another party "as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." Subdivision (b)(2) of that section defines "frivolous" as "totally and completely without merit" or "for the sole purpose of harassing an opposing party." Subdivision (b)(1), thereof states " '[a]ctions or tactics' include, but are not limited to, the making or opposing of motions or the filing and services of a complaint or cross-complaint." Thus, subdivision (a), prohibits "actions," i.e., behavior or conduct, and "tactics," i.e., skillful methods designed to gain a goal, which are frivolous. The syntax and context of "actions" indicate a broader use of the word was contemplated than merely a noun meaning "complaint." This inclusive interpretation is buttressed by the clear language, "but are not limited to." Also, section 128.5 clearly applies to proceedings not involving complaints such as judicial arbitration.

In *Lesser* v. *Huntington Harbor Corp.* (1985) 173 Cal.App.3d 922, 930 [219 Cal.Rptr. 562], the court stated, "Nothing in section 128.5's language limits the section's application only to *tactics or motions*. In fact, the section specifically states frivolous actions are not limited to *making or opposing*

---

*See footnote, *ante*, page 207.

motions without good faith. A reasonable interpretation is that the section *also applies to entire actions* not based on good faith which are frivolous or cause unnecessary delay in the resolution of a dispute. [Fn. omitted.]" (First and second italics ours.)

The above analysis of the statute and the *Lesser* rationale provide support for our conclusion that Code of Civil Procedure section 128.5 applies to the opposing of an entire action without proper justification, or to the interposing of a frivolous defense to an action.

Code of Civil Procedure section 128.5, subdivision (c) requires an order imposing sanctions to be in writing and to "recite in detail the conduct or circumstances justifying the order." In the case at bench the trial court's order of November 16, 1988, found that "as late as September 15, 1987 is a point at which time a reasonable attorney should have known the defense was without merit." The order granted plaintiffs' motion for attorney fees accrued after September 15, 1987, in the amount of $27,905.00. On November 28, 1988, the trial court filed an "Order Granting Sanctions/Attorneys' Fees Pursuant to C.C.P. Section 128.5."

 That order stated that the trial court found the defense in bad faith, frivolous, and solely intended to cause unnecessary delay. There followed a detailed recitation of why the trial court disbelieved the testimony of Oakerson, defendant's sole witness on the merits at trial. It found that the defendant believed a valid contracted existed, based on Oakerson's testimony in his November 1983 declaration stating that a valid, binding contract existed between defendant and the American Broadcasting Companies, Inc. As trial evidence later established, however, at that time no lease had been signed between defendant and ABC. The trial court concluded that "[d]efendants's reliance on the absence of a written lease between plaintiffs and defendant to support its contention that no contract existed must accordingly have been in bad faith."

The trial court noted that during pretrial proceedings listed in the order, numerous judges rejected defendant's contention that no contract existed. The trial court focused on a November 21, 1985, minute order denying defendant's summary judgment motion and denying summary adjudication of controverted issues. The ruling's statement of decision listed several issues on which summary adjudication was denied upon the finding of a triable issue of fact, specifying defendant's proof as Oakerson's declaration and plaintiffs' proof as Oakerson's deposition. The trial court found that testimonial conflicts between Oakerson's deposition and his declaration meant that one or the other was untrue.

The court cited these findings in concluding that at some point in the proceedings, "it should have become clear to any reasonable attorney or other reasonable person that the defense of this action by the defendant was totally and completely without merit. The Court finds that such point in time was not later than the date of the first Mandatory Settlement Conference herein, September 15, 1987, although it could well have been before that date."

The statement of decision imposing sanctions poses no problems as regards its specificity. Unlike the "conclusory terms" in *Garcia* v. *Sterling, supra*, 176 Cal.App.3d 17, 23, cited by defendant, the statement of decision sets forth findings of fact. It states " 'the specific circumstances giving rise to the award . . . and state[s] with particularity the basis for finding those circumstances amount to "tactics or actions not based on good faith which are frivolous or which cause unnecessary delay." ' " Certainly it is " '. . . more informative than a mere recitation of the words of the statute. . . .' " (*Lieppman* v. *Lieber* (1986) 180 Cal.App.3d 914, 921 [225 Cal.Rptr. 845].)

We find no merit in defendant's claim on appeal.

■ Following oral argument in this case, the court ordered additional briefs and oral argument limited to whether Code of Civil Procedure section 128.5 sanctions may be imposed on a defendant for the bad faith assertion of a frivolous and unmeritorious defense. What was submitted was of minimal assistance.

We agree with the trial court's order imposing the sanctions.

Code of Civil Procedure section 128.5, subdivision (a) provides, in part, as follows: "Every trial court may order a *party*, the *party's* attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by *another party* as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay. . . ." (Italics added.)

By its express terms, the trial court may impose sanctions on any party. This language certainly does not exclude defendants.

The California Supreme Court in *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863 [254 Cal.Rptr. 336, 765 P.2d 498], discussed the matter of sanctions in the relevant context of malicious prosecution.

The court stated: "After reviewing the competing policy considerations, we agree with those decisions and commentaries which have concluded that

the most promising remedy for excessive litigation does not lie in an expansion of malicious prosecution liability. As the Supreme Court of Michigan had recently noted, 'In seeking a remedy for the excessive litigiousness of our society, we would do well to cast off the limitations of a perspective which ascribes curative power only to lawsuits.' (*Friedman* v. *Dozorc* [(1981) 412 Mich. 1] 312 N.W.2d [585,] 600.) While the filing of frivolous lawsuits is certainly improper and cannot in any way be condoned, in our view the better means of addressing the problem of unjustified litigation is through the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself, rather than through an expansion of the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded. In recent years, the Legislature has taken several steps in this direction, enacting legislation to facilitate the early weeding out of patently meritless claims and to permit the imposition of sanctions in the initial lawsuit—against both litigants and attorneys—for frivolous or delaying conduct. (See, e.g., Code Civ. Proc., §§ 437c, 1038, 128.5, 409.3.) Because these avenues appear to provide the most promising remedies for the general problem of frivolous litigation, we do not believe it advisable to abandon or relax the traditional limitations on malicious prosecution recovery. This general perspective informs our analysis of the more specific questions presented by this case, to which we now turn." (47 Cal.3d at pp. 873-874.)

In *National Secretarial Service, Inc.* v. *Froehlich* (1989) 210 Cal.App.3d 510, 525, footnote 13 [258 Cal.Rptr. 506], we found the defendants had used the legal system ". . . in an attempt to club a legitimate creditor into submission by forcing and extending this litigation when they in fact had no valid defenses. . . ."

We then declared, "It is perhaps time that the courts, both trial and appellate, begin to speak and react more forcefully with respect to cases such as this one. Such an abuse of the legal system for no other purpose than to avoid paying a legitimate claim simply can no longer be tolerated. It is not fair to the opposing litigant who is victimized by such tactics and it is not fair to the greatly overworked judicial system itself and those citizens with legitimate disputes waiting patiently to use it. In those cases where such an abuse is present, an award of substantial sanctions is proper." (210 Cal.App.3d at p. 526, fn. omitted; see also *580 Folsom Associates* v. *Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 26-27 [272 Cal.Rptr. 227].)

We therefore affirm the trial court's order imposing sanctions pursuant to Code of Civil Procedure section 128.5.

## DISPOSITION

The judgment and award of sanctions are affirmed. Costs are awarded to respondents.

Klein, P. J., and Croskey, J., concurred.