Cephler Harrison *et al. v.* S. R. Miller, *Exec., etc.*

(No. 9301)

Submitted May 12, 1942. Decided June 30, 1942.

M. O. *Litz* and *John L. Gillespie,* for appellants.
W. *French Boggess,* for appellee.

RILEY, JUDGE:

This suit, involving a tract of land containing approximately one hundred and sixty-four acres in Ripley District, Jackson County, of which Fannie Harrison died seised, was instituted in the circuit court of said county by plaintiffs (Cephler, Gay and Kermit Harrison, Bessie Harrison Fisher, and Hazel Harrison Owens), children of decedent, against S. R. Miller in his individual capacity, as executor of the last will and testament of Fannie Harrison, deceased, and as guardian of Bessie Harrison Fisher, Hazel Harrison Owens and Kermit Harrison, for the purpose of setting aside an alleged pretended sale of the real estate to defendant in his individual capacity, or, in the alternative, that as executor aforesaid, he be required to account for the proceeds of sale thereof. The trial chancellor's decree granted the second alternative prayer, which decree plaintiffs seek to reverse. Defendant assigns cross-error.

Fannie Harrison died testate March 20, 1925, and under the terms of her last will and testament devised the real estate involved in this controversy to plaintiffs. The will provided in part as follows:

> "It is my desire and request that my executor use his best efforts to keep *in tact* the farm aforesaid in accordance with the stipulations hereinbefore set out, and that he renew, if possible, the notes now held by brothers wife Emma Miller, which are evidenced by lien or deed of trust against said farm aforesaid, and with the exception of this contingency as to the collection of

the notes against said farm, I do direct that said farm *beheld in tact* by *by* said executor in accordance with the foregoing stipulations until my son Kermit attains the age of twenty-one years, * * *."

(Kermit, the youngest son, was born in 1915.) The will nominated defendant, brother of decedent, as executor, and he qualified and acted as such. Defendant also was appointed guardian for three of the plaintiffs, who were infants at the time of their mother's death. At the demise of Fannie Harrison, the land was encumbered with a deed of trust to secure the payment of a note in the amount of approximately nine hundred dollars owned by Emma Miller, defendant's sister-in-law. A short time before her death Fannie Harrison requested defendant, her brother, to "take up this deed of trust" which he agreed to do; and shortly after she died, defendant "took the note over" for which he paid "$900 and interest to J. F. Miller and Emma Miller." According to defendant, he was told by "some few people around here" that "a deed of trust could not be turned over like a note", and he then requested Frank Miller, husband of Emma Miller, to return his money to him. Frank Miller had already expended a portion of the money and, as defendant relates, suggested that the land be sold and promised defendant he would have the trustee in the deed of trust sell the land. The trustee was directed by Frank Miller to sell the land pursuant to the terms of the trust deed; and although the trustee says that Emma Miller was present at the time of direction, she denies any knowledge thereof and asserts positively that she did not authorize her husband to direct any sale of the property under the trust instrument.

Public sale of the real estate took place September 12, 1925—approximately six months following the death of Fannie Harrison. Several persons bid for the property, and the highest bid of $2,450.00, offered by defendant, was accepted. He explained, "I came here with no intention of buying the land—never thought of such a thing—

but came here to bring it a real value for them children, that is why I bid on that land," and again when asked why he bid as much as he did, he responded, "To try to help the heirs, because they was my blood kin." Mrs. Grace Casto and W. C. Harrison, aunt and uncle, respectively, of plaintiffs, testified as to their ability and willingness to pay the indebtedness had they known of the intended sale, and there is no evidence of any attempt on defendant's part to advise them thereof.

A large portion of the testimony relates to the value of the farm, and the estimated worth thereof varies from two thousand dollars to ten thousand dollars. Likewise, the evidence is conflicting as to whether this land was under lease for oil and gas purposes at the time of decedent's death. Defendant states positively that, "it was not under lease when I bought it", yet plaintiffs introduced an original oil and gas lease from Fannie Harrison to South Penn Oil Company, under date of July 18, 1923, and recorded in the office of the Clerk of the County Court of Jackson County, which provides for the payment of $41.00 quarterly in advance as delay rentals; and while the record also contains a certified copy of a recorded lease executed by defendant and wife to United Fuel Gas Company, dated July 28, 1926, which provided a similar quarterly delay rental, the record does not indicate any surrender of the lease to South Penn Oil Company.

Hagar Harrison, divorced husband of decedent, testified that he conveyed the land in controversy to his wife through a third person in 1923, and that he rented the farm for four or five years prior thereto, receiving $350.00 as rental for the first year, two years at an annual rent of $250.00 and "the other was grain rent." He named one Hugh Barnhart as the person who had paid him $350.00, but Barnhart denied paying any "cash rent" and insisted he paid "grain rent."

The trial chancellor was of opinion that the price paid by defendant for the farm was adequate, and we are not disposed to disturb that finding. In a written opinion, made part of the decree, the chancellor exonerated de-

fendant from fraudulent conduct, concluded that defendant's fiduciary relationship to the plaintiffs destroyed the transaction in which defendant "was both seller and buyer", denied defendant's theory that he was entitled to an allowance for improvements, but was of opinion that "broad principles of equity demand that the second alternative in the bill", namely, that the proceeds of sale be decreed plaintiffs "should be adopted as the basis of" the decree which provides that "plaintiffs are entitled to recover of and from the defendant, S. R. Miller, the sum of $2700.63, with interest * * *." Plaintiffs contend that the decree is erroneous because (1) the sale was illegal in that it had not been advertised in compliance with the statute, (2) defendant is guilty of both actual and legal fraud, (3) the sale price of the property was wholly inadequate. Defendant likewise argues that the plaintiffs should be denied relief because (1) "of election of remedies and laches, both of which they are guilty" and (2) the trial court made its findings against Miller individually, "ignoring his fiduciary relationship".

Since the bill of complaint is based upon the alleged fraud of Miller, we shall consider first whether the charge is substantiated by the testimony. The opinion of the trial chancellor exonerates him of fraudulent action but condemns his purchase of the land because "he was both seller and buyer in the same transaction" and further because it is "the fiduciary relationship that destroys the transaction." The will, under which Miller was appointed executor directed him to use his best efforts "to keep in tact the farm" until the youngest child reached twenty-one years of age and to "renew, if possible, the notes now held by" Emma Miller. By qualifying as executor, he assumed those duties which the law imposed upon him; and although the direction to "keep in tact the farm" must be regarded in the light of the existing indebtedness against it and therefore not absolute, nevertheless assumption of duties as executor required that defendant's conduct be consonant with the directions of the will and not in conflict therewith or with the interests of the estate

or those of the beneficiaries under the will for whose benefit the directions were intended.

Were defendant's activities in relation to the land in harmony with those directions? The decedent, Fannie Harrison, reposing confidence in defendant, her brother, had requested that he "take up this deed of trust" in order that her property might be protected from foreclosure, and his agreement so to do undoubtedly prompted her appointment of him as executor of her estate. He qualified as such and also as guardian of decedent's three infant children, and apparently set out to fulfil his promise to a dying sister. The record establishes clearly that there was no occasion for defendant to have paid the indebtedness to Emma Miller for she testified that prior to defendant's payment of the note, she had neither demanded payment thereof, nor requested sale of the property. On behalf of the defendant it is argued that Frank Miller, husband of Emma Miller, and not defendant, directed sale of the property. As owner of the indebtedness secured by the trust deed, the only person who could properly direct sale by the trustee was defendant himself. He knew that Frank Miller had directed the trustee to sell the property, but the record does not mirror a single act by defendant to save the land from sale. It was true that it was defendant's money which had been used to pay Emma Miller, but it is likewise true that it was this payment and the later attempt on defendant's part to be reimbursed therefor that brought about the sale of the land under the deed of trust. It is clear that the sole reason for the sale emanated from the wish of this defendant to obtain his money, and there is not a word of testimony in a voluminous record which reflects any attempt on defendant's part to acquire his money except through sale of the property. Defendant, as a creditor of the estate, could have instituted suit to subject the real estate to sale and submitted to a court of competent jurisdiction the necessity for sale. Code, 44-8-7. Purchase by him at a judicial sale could have brought him the judicial approbation afforded under the rule of *Brown* v. *McGraw*, 98

W. Va. 607, 128 S. E. 124, which permits a fiduciary, who is likewise a creditor of a decedent to purchase real estate where the sale is for an adequate price, at open competition, without suspicion of fraud, and the sale regularly conducted, reported, and confirmed. The indebtedness was not a large sum. It seems that defendant had no difficulty in leasing the land for oil and gas purposes a short time after sale. Could he not have done so, in order that it would have inured to the benefit of the estate, and also have used the rentals to repay the indebtedness? Did defendant attempt to lease the land as a farm so that the income therefrom might discharge the indebtedness? He does not claim any effort so to do. The record presents clearly a picture of a fiduciary who, being also a creditor of the estate which he has undertaken to preserve, pays lip-service to performance of his duties in his trust capacity knowing full well that by his passive conduct the activity set in motion by him as a creditor will destroy the *res* he has promised to protect. In the light of this attitude, defendant's testimony that he had no intention of bidding for the property and that he did so only in the interest of Fannie Harrison's children is not appealing.

We think the trial chancellor correctly concluded that defendant's fiduciary relationship destroyed the transaction. "A person in a fiduciary relation to another who purchases property for himself individually may be chargeable as constructive trustee of the property, even though he purchases it from a third person and not from himself as fiduciary." Scott on Trusts, Vol. 3, page 2413. See also 11 R. C. L. 358, where the rule is stated thus:

"Since an executor or an administrator is an officer designated by law for a special purpose and is clothed with a particular trust, the principle is fundamental that he has no right to enter into a private contract that may interfere with the duties prescribed by law, or to create in himself in any way an interest opposite to that of the party for whom he acts, or to deal in any way with the estate for his own benefit. Therefore,

> the law forbids him to act in the double capacity of seller and buyer, because of the obvious conflict between official duty and personal interest, in that as a buyer he is interested in procuring the property at the lowest possible price, while as seller his duty requires him to obtain the highest price at which the property may be fairly sold."

Having so concluded that defendant is a constructive trustee for plaintiffs, we do not deem necessary any consideration of the alleged invalidity of sale because of noncompliance with the advertising requirements of the statute, of which plaintiffs complain.

It is urged by defendant that plaintiffs are barred from relief because of election of remedies and laches.

The record discloses that in January, 1928, Miller appeared before C. W. Staats, a commissioner of accounts of Jackson County, who found that defendant was chargeable with $1,344.67, which represented the balance of assets of the estate owing to plaintiffs. At November Rules, 1932, plaintiffs instituted a suit against defendant, the purpose of which was to surcharge and falsify the settlement made by defendant before Commissioner Staats. In that suit Miller answered and averred that he had the sum of $1,344.67 in his hands, to be disposed of in the manner provided in Fannie Harrison's will. The suit, heard on bill and answer, was dismissed and relief denied. In 1935 one of plaintiffs sought the advice of H. D. Rollins, an attorney whose office is located in Charleston, and he and Rollins drove to Ripley and sought to examine the file of papers in the 1932 suit. They were advised by the circuit clerk that the papers were missing from his office, and that the attorney who had represented plaintiffs had died and his office had burned. Further inquiry was made of counsel who had represented defendant in said suit, who stated he knew nothing of the papers. Following this fruitless search, Rollins, as counsel for plaintiffs, caused an accounting to be held by Oliver D. Kessel, a commissioner of accounts who, on October 30, 1935, gave defendant notice to appear for an accounting as guardian

of the three infants. On July 3, 1936, the county court directed defendant to settle his accounts as executor. Despite the assertion of defendant in his answer in the 1932 suit (which answer was not available to plaintiffs during the accounting proceeding) that he had $1,344.67 in his hands, he took the position in the settlement proceeding before Commissioner Kessel that he had invested $1,300.00 of that amount on July 14, 1928, in Jackson Building & Loan Association, an institution which had become insolvent. While the evidence shows that the investment was made by Miller in his individual capacity, he insisted that he "told the man * * * that he wanted him to keep interest and all for these children"; and the commissioner found that he was entitled to a credit of $1,052.00, that representing the loss on the investment. The commissioner found also that defendant owed $66.13 to each of plaintiffs. Upon exceptions taken by plaintiffs, the county court affirmed the commissioner's report, but the Circuit Court of Jackson County awarded plaintiffs a writ of error which, on April 6, 1937, was dismissed because of plaintiffs' inability to provide bond.

On September 11, 1937, this suit was instituted. Meanwhile, in July, 1937, the clerk of the circuit court located the missing file of papers (1932 suit) in the office of the attorney who had represented defendant in that suit. The record discloses that although defendant complied with a request from Rollins that the amount found by the commissioner be sent to him, plaintiffs refused to accept the awards and the money is still in Rollins' possession.

An election of remedies presupposes the existence of a choice of two or more inconsistent remedies. See 20 C. J. 21. In the instant case, the suit which plaintiffs had instituted in 1932 was dismissed, upon defendant's motion, when considered by the circuit court upon bill and answer wherein defendant admitted owing plaintiffs a stated sum of money; and while the dismissal order does not recite the reason therefor, it is apparent that dismissal was based upon defendant's averment in the answer that payment of the money due plaintiffs could not be made until the

youngest of decedent's children had reached his majority, to-wit, 1936, in accordance with the terms of the will. Hence, it does not appear that, at that time, plaintiffs had a choice for election. 18 Am. Jur. 134. It is a further rule that a prerequisite to election is knowledge on the part of the suitor of the facts material to his rights. 18 Am. Jur. 144.

Rollins asserted that had he known that the 1932 suit was one seeking an accounting, he would have instituted a suit predicated upon fraud. Defendant's counsel argued that had plaintiffs' counsel been diligent in his search, he would have discovered that another lawyer with offices also in Charleston was co-counsel for plaintiffs in the 1932 suit, and the purpose of that chancery cause could have been ascertained from him. We do not think such failure is controlling on the issue of election of remedies. The pertinent factor is that the papers were not available to plaintiffs' counsel at a time when knowledge of their contents would have charged plaintiffs with the duty to elect. Moreover, the missing file was found following termination of the proceedings which were initiated by Rollins on plaintiffs' behalf before Commissioner Kessel, in an office where inquiry had been made in an effort to locate it. If there is any divergency of positions in the record of this suit, it is in the defendant's statements, both under oath. There is certainly nothing consonant in the assertion of defendant's answer in the 1932 suit that he had a stated sum of money in his hands for payment to plaintiffs in accordance with the will, and the position taken by him before Commissioner Kessel whereby that officer was induced, on statements directly at variance with his previous assertion, to give him credit for a large sum of money as a loss in the building and loan investment. We are therefore not persuaded by argument that finality of that proceeding is a bar to plaintiffs in this suit.

We do not think that defendant's argument that plaintiffs are barred from relief because of laches is tenable. The trial court's opinion aptly states that "the circum-

stances of this case clearly show that the plaintiffs were at all times battling and contending for their property rights and were using every means at their command to secure them and in the end refused to accept from their attorney the amount sent to him for them." Applicable to the instant discussion is the definition of laches, expressed thus in *Bank of Marlinton v. McLaughlin*, 121 W. Va. 41, 17 S. E. (2d) 213, Pt. 2, Syl.:

> "Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right."

Defendant argues that he is entitled to be subrogated to the trust deed lien of Emma Miller, that he be repaid the consideration that he gave for the land at the sale thereof, with interest, and that he be repaid for all improvements placed on the real estate by him. We shall consider first the matter of improvements.

The record establishes the fact that defendant has placed valuable improvements on the land. The cost of one dwelling house alone is estimated in excess of six thousand dollars, while other improvements are valued at approximately two thousand dollars. In *Kelly, Conservator v. Bank of Mt. Hope*, 117 W. Va. 260, 185 S. E. 215, this Court approved the rule laid down in *Dawson v. Grow*, 29 W. Va. 333, 1 S. E. 564, that to entitle a claimant to the fair value of his improvements, they must have been placed upon the land by such claimant without notice, actual or constructive, of another's superior claim. In *Pittsburgh & West Virginia Gas Co. v. Pentress Gas Co.*, 84 W. Va. 449, 100 S. E. 296, 298, 7 A. L. R. 901, it was said:

> "Why should one be treated as acting in good faith when dealing with property as his own when he knows all the facts which constitute his claim as well as the claim of his adversary, which facts when properly construed give him no title to the land? Such a holding would make every man a judge of the law in his own case, instead of being bound by the law as interpreted by those charged with that duty."

While in that case, defendant was denied the value of improvements placed upon the land because the court characterized defendant as a wilful trespasser, we think the language is likewise persuasive where any wrong-doer seeks to invoke the aid of a court of equity. The bulk of improvements placed by defendant upon the land occurred after July 10, 1937, when he sent the checks to Rollins to make payment to plainitffs. The present suit was instituted in September, 1937. Under the foregoing principles, we are of opinion that defendant is not entitled to recover for any improvements from the time he was placed on notice of plaintiffs' claim that they were asserting title to the land itself. Defendant should, however, be subrogated to the lien which secured payment of the indebtedness to Emma Miller and according to the tenor of the note which evidenced that indebtedness. *Bank of Marlinton* v. *McLaughlin, supra.* We are not disposed to disturb the conclusion of the trial chancellor which refused defendant credit for the alleged loss of funds in connection with his investment in Jackson Building & Loan Association, and we are of opinion that there is no occasion to repay to defendant the consideration paid for the land at the trustee's sale thereof, since he has not actually paid plaintiffs that consideration. However, a proper accounting should be had wherein the sum of money which Rollins has in his possession should be refunded defendant who should be credited also with any taxes he has paid upon the land as well as any other items expended by him in maintaining said property and, likewise, plaintiffs should be credited with such items as should have inured to them as incidents of the ownership of said land, including the rental value of the land.

We reverse the judgment of the circuit court and remand the cause for further proceedings consonant with the tenor of this opinion.

*Reversed and remanded.*