**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HOMELAND TRAINING CENTER, LLC,
a Tennessee Limited Liability
Company,

*Plaintiff-Appellant,*

v.

SUMMIT POINT AUTOMOTIVE
RESEARCH CENTER, a West Virginia
Limited Liability Company,
individually and in its capacity as
Trustee of the William Scott Inter
Vivos Trust,

*Defendant-Appellee,*

and

WILLIAM SCOTT INTER VIVOS TRUST,

*Defendant.*

No. 08-2272

HOMELAND TRAINING CENTER, LLC,
a Tennessee Limited Liability
Company,

> *Plaintiff-Appellee,*

v.

SUMMIT POINT AUTOMOTIVE
RESEARCH CENTER, a West Virginia
Limited Liability Company,
individually and in its capacity as
Trustee of the William Scott Inter
Vivos Trust,

> *Defendant-Appellant,*

and

WILLIAM SCOTT INTER VIVOS TRUST,

> *Defendant.*

No. 08-2273

Appeals from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
John Preston Bailey, Chief District Judge.
(3:07-cv-00160-JPB)

Argued: October 27, 2009

Decided: February 3, 2010

Before WILKINSON, DUNCAN, and DAVIS,
Circuit Judges.

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Wilkinson wrote the opinion, in which Judge

Duncan joined. Judge Davis wrote a separate opinion dissenting in part and concurring in part.

---

**COUNSEL**

**ARGUED**: John Harlan Mahaney, II, HUDDLESTON & BOLEN, LLP, Huntington, West Virginia, for Homeland Training Center, LLC. William Richard McCune, Jr., Martinsburg, West Virginia, for Summit Point Automotive Research Center. **ON BRIEF:** J. Jarrod Jordan, HUDDLESTON & BOLEN, LLP, Huntington, West Virginia, for Homeland Training Center, LLC. Peter L. Chakmakian, PETER L. CHAKMAKIAN, LC, Charles Town, West Virginia; Alex A. Tsiatsos, WM. RICHARD MCCUNE, JR., PLLC, Martinsburg, West Virginia, for Summit Point Automotive Research Center.

---

**OPINION**

WILKINSON, Circuit Judge:

After one party to a contract repudiated it, the other party filed an action for breach of contract and requested an order of specific performance. As the litigation progressed, it became apparent that the repudiation had destroyed any prospect of salvaging the contract, prompting the non-repudiating party to abandon its earlier request for specific performance and to seek monetary damages instead. The district court, however, held that as a matter of West Virginia law, the original decision to seek specific performance precluded the non-repudiating party from being able to claim monetary damages. This was error. The theory of waiver on which the district court predicated its ruling is not supported by West Virginia contract law or the law of contracts generally. The district court's ruling lets a party who repudiates a contract force a

non-repudiating party into a premature election of remedies. Allowing the repudiating party to gain the upper hand in this manner would undermine the value of contractual commitments. We therefore remand this case for trial on the issue of damages occasioned by the repudiation.

I.

Defendants Summit Point Automotive Research Center, LLC, and the William Scott Inter Vivos Trust, (collectively, "SPARC") own a training facility in Jefferson County, West Virginia, that is used by government security personnel. On July 25, 2006, as part of a plan to have certain complementary services provided on-site, SPARC agreed to lease 12 acres of undeveloped land at the facility to another company. Although the lease agreement took effect upon signing, it provided that the initial term would not begin unless SPARC's tenant chose to initiate it. The lease also provided, however, that SPARC could force a decision one way or the other by obtaining the necessary permits for the site and recording a "final plat," a term described at some length by local ordinance. *See* Jefferson County, W. Va., Subdivision Ordinance, art. 3, § 1a; art. 8, § 1c. This worked in two ways. First, the lease would automatically terminate once a plat was recorded unless the tenant notified SPARC within sixty days that it desired to proceed. Second, if the lease were kept alive, the initial term would automatically begin 120 days after recordation unless the tenant indicated that it had not obtained satisfactory financing.

The lease allowed the tenant to assign its interest if SPARC consented to the assignment in advance. SPARC could not unreasonably withhold its consent, but the tenant would remain liable under the lease unless the beneficiary of the assignment had a net worth greater than $10 million. The lease also provided that each party could request that the other affirm or deny the contract's continued validity on ten days'

notice. Finally, it allowed for an award of attorneys' fees to a "prevailing party" in litigation.

On October 3, 2006, Homeland Security Corporation, SPARC's original tenant, executed an assignment of its rights under the lease to Homeland Training Center, LLC, ("HTC"), the plaintiff in this suit. SPARC was not asked for its written consent prior to the assignment, but it was informed of the assignment in December 2006. Nine months after being notified, SPARC sent a letter requesting verification that HTC had a net worth of at least $10 million, but also stating that if SPARC had known of the assignment ahead of time, "[w]e would, of course, have consented to this transaction."

HTC entered into negotiations in early 2007 with an investment company it hoped would finance the project. SPARC, however, formed the opinion that HTC was not doing enough to position itself to proceed with the lease, and in June 2007 it communicated its concerns to HTC in writing. HTC responded by letter several days later, describing its efforts up to that point. The parties met to discuss the issue on July 23, 2007, and in the course of the meeting, SPARC told HTC that it would probably be filing a "merger plat" soon. This was thought to be faster than the subdivision process associated with preparation of a "final plat." On August 7, 2007, SPARC filed a merger plat in the Jefferson County Clerk's Office, but it did not notify HTC that it had done so. Shortly thereafter, SPARC also asked to amend the lease to provide that the initial term of the lease would begin no later than December 1, 2007, but HTC denied the request.

SPARC first notified HTC that it had actually filed the merger plat in a letter dated October 17, 2007. That letter stated that the lease had terminated because HTC had failed to provide notice of its determination to proceed within sixty days of the plat recording. HTC responded on October 26, 2007, stating that the merger plat was not a "final plat" within the meaning of the lease, that the lease remained "in full force

and effect," and that it intended "to perform under the Lease as such." SPARC replied on October 31, stating that "[t]he Lease has been terminated by [HTC's] inability or refusal to adhere to its terms." That same day, HTC received a commitment letter from the investment company with which it had been negotiating since the start of the year. The letter expired before it could be acted upon, however.

On December 4, 2007, HTC wrote SPARC to say that it had received commitments for financing, but that because of SPARC's having "taken the position that the Lease is terminated, HTC will likely be unable to close on the funding and to consummate the transactions with its funding sources." HTC asked SPARC whether it would "acknowledge that the Lease between the parties is still in effect and avoid this impending problem." The next day, HTC filed a breach of contract suit in federal district court for the Northern District of West Virginia. The suit sought a preliminary injunction, which was granted shortly thereafter, and requested an order of specific performance. Later that same day, SPARC responded to HTC's December 4 letter by fax, stating that it would neither admit nor deny the continued existence of the lease, but offering to "accept the lease as it stands" if HTC provided proof of financing by January 15, 2008. Three weeks later, SPARC filed counterclaims for breach of contract against HTC, alleging that HTC had breached the lease by failing to make sufficient efforts to obtain financing and by participating in the assignment from Homeland Security Corporation.

In January 2008, HTC disclosed the litigation to the various investors who had pledged to finance the project, prompting them all to withdraw. Throughout the spring, HTC worked to make alternative financing arrangements. SPARC, meanwhile, prepared a new plat of the property, one which indisputably qualified as a "final plat," and duly recorded it after approvals had been obtained. With two weeks to go before HTC would be forced to notify SPARC that it wished to keep

the deal alive, the venture capital firm that HTC saw as its last chance to secure financing informed HTC that while it was interested in financing the project, it would not become involved unless the lease dispute was resolved. One week later, HTC notified SPARC that it was exercising its option to terminate the lease. Thereafter, HTC dropped its claim for specific performance and instead asked the district court for an award of damages.

Both sides filed motions for summary judgment. The district court rejected each of SPARC's counterclaims, holding that HTC was under no duty to seek out financing within any particular time frame and that, while the assignment was improper, SPARC had waived any claim by assenting to it after the fact. The district court also held that although SPARC had repudiated the contract, HTC could not bring a damages action based upon the repudiation because its earlier decision to request specific performance constituted a binding election not to terminate the contract. In short, the court held that though both sides had breached the contract, neither side could recover for breach. Both sides appealed from the district court's rulings.

## II.

We review the grant or denial of motions for summary judgment *de novo*, applying the same standard as the district court. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). In general, the interpretation of a written contract is a question of law. *Williams v. Professional Transp., Inc.* 294 F.3d 607, 613 (4th Cir. 2002). Jurisdiction is founded on diversity of citizenship, and on questions of substantive law, this court must apply the law that the forum state, West Virginia, would apply if it heard the case. *CACI Intern., Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg Co.*, 313 U.S. 487, 496-97 (1941)). It is undisputed that West Virginia would apply its own law to the questions before us.

III.

We begin with SPARC's arguments, raised by way of cross-appeal. We conclude that the district court was correct to reject each of these arguments, which we address in turn.

First, SPARC claims that HTC breached the lease by failing to make sufficient efforts within a "commercially reasonable" period of time to line up financing. It is unnecessary for us to determine whether HTC's efforts to obtain financing were so meager as to be "commercially unreasonable," for no duty of commercial reasonableness of the sort SPARC asserts existed. Under West Virginia law, commercial reasonableness is a "gap filler," invoked only when a disputed issue is not addressed in explicit terms by the parties. *See First Nat'l Bank of Bluefield v. Clark*, 447 S.E.2d 558, 562 (W. Va. 1994) ("[W]here a contract fixes no definite time for performance, the law usually implies that performance shall be within a reasonable time."). In this case, the lease provided that the initial term would begin 120 days after SPARC filed a "final plat," unless HTC considered its financing options unsatisfactory, in which case HTC could postpone the start of the initial term. At a minimum, then, the lease gave HTC 120 days to attempt to secure financing. Any duty to act within a "commercially reasonable" time would only apply if HTC chose to delay the commencement of its obligations under the lease beyond the 120-day mark.

This never occurred, however. The district court ruled that the "merger plat" filed by SPARC did not qualify as "final plat" under the lease, and SPARC has not challenged that ruling on appeal. A duty of commercial reasonableness could not arise until 120 days after the filing of the second plat in the spring of 2008, but by that point, HTC had already exercised its contractual right to terminate the lease due to difficulties with financing. The lease therefore was never held open into the period when HTC would have been subject to a duty of commercial reasonableness. Moreover, even if we accepted

SPARC's position that the "merger plat" qualified as a "final plat" and the lease terminated sixty days later after HTC failed to take action, it is equally the case that the commercial reasonableness duty would be inapplicable since the 120-day mark would never have been reached.

Next, we consider SPARC's claim that the assignment from Homeland Security Corporation to HTC constituted a breach of the contract. The lease agreement demanded that SPARC's written consent be obtained prior to any assignment, which did not occur. The assignment therefore violated the terms of the lease and clearly constituted a breach, as the district court held. That said, SPARC never expressed any opposition to the assignment after learning of it in December 2006 and in fact acknowledged in its letter of September 2007 that it would "of course" have assented to the assignment if notice had been given. SPARC thus waived any right to claim a breach based on the assignment, as SPARC itself concedes. SPARC nonetheless argues that the waiver should not be given effect because the waiver was made without knowledge of HTC's net worth. SPARC, however, realized that it had not ascertained HTC's net worth at the time of its waiver. After all, SPARC requested that information in the very same letter in which it approved the assignment. Having given its blessing without reservation and in full knowledge that it had not learned HTC's net worth, SPARC's waiver was sufficiently informed to be effective.

Finally, SPARC contends that the district court erred in its conclusion that SPARC repudiated the lease. The doctrine of anticipatory breach allows a suit for breach of contract to be brought if one party to a contract renounces its future contractual obligations, in essence promising ahead of time not to perform when performance comes due. *See* Robert J. Riley, *The Doctrine of Anticipatory Breach as Applied in West Virginia*, 31 W. Va. L.Q. 182, 183 (1925). Under West Virginia law, to constitute a contractual repudiation, a statement renouncing a contract must be "positive, absolute and

unequivocal." *Mollohan v. Black Rock Contracting, Inc.*, 235 S.E.2d 813, 816 (W. Va. 1977). Both SPARC and HTC point to the record of each party's conduct after October 17, 2007, in support of their respective claims concerning repudiation. The dispositive consideration, however, is whether SPARC objectively manifested an unwillingness to perform under the contract—not its actual, subjective intention. *See Record Club of America, Inc. v. United Artists Records, Inc.*, 643 F. Supp. 925, 940 n.10 (S.D.N.Y. 1986), *vacated on other grounds by* 890 F.2d 1264 (2d Cir. 1989). The post-October 17 evidence is relevant only to the separate and secondary issues of whether, even if the statement was a repudiation, HTC was in some way barred from obtaining the relief it sought. (*See infra*.) Whether the letter amounted to a repudiation depends here on the nature of the statement and the surrounding circumstances at the time it was made.

The district court was correct to find a repudiation. SPARC's letter of October 17, 2007, declared that because HTC had not expressed its intention to proceed with the lease within sixty days of the "merger plat" filing, "the lease has been terminated by the tenant." The statement contained no caveat or qualification and its tone was firm. Furthermore, SPARC was not compelled to take such a precipitous course of action, since the lease allowed either party to request verification from the other that the lease was still in effect. SPARC, evidently seeking to get out of the contract as fast as it could, rejected such a course. Particularly in light of SPARC's option to request assurances, the only reasonable conclusion HTC could draw after receiving the October 17 letter was that SPARC was not going to perform under the lease, which seems exactly the message SPARC was trying to convey. Moreover, SPARC failed even to notify HTC of its plat filing so that HTC would be aware of the possible need to make a determination to proceed. SPARC's failure to do so, and instead to attempt to bring about the termination of the contract by stealth, further underscores the correctness of the district court's determination that a repudiation occurred.

IV.

We turn then to the crux of this dispute. The district court found that while SPARC had unjustifiably repudiated the contract, HTC could not obtain monetary damages for breach of contract because it had initially brought, though later abandoned, a claim for specific performance. This conclusion was in error.

A.

The case before us presents what is in essence a straightforward question of election of remedies law. The common law doctrine of election of remedies applies where two possible remedies are available for the same legal injury. *See Harrison v. Miller*, 21 S.E.2d 674, 678 (W. Va. 1942) (citation omitted). The basic purpose of the doctrine is to prevent a plaintiff from obtaining a windfall recovery, either by recovering two forms of relief that are premised on legal or factual theories that contradict one another or by recovering overlapping remedies for the same legal injury. *See Dionne v. Mayor and City Council of Baltimore*, 40 F.3d 677, 681 (4th Cir. 1994); *see also* 25 Am.Jur.2d Election of Remedies § 3.

Election of remedies doctrine also has a sequencing component. *See Kansas State Bank in Holton v. Citizens Bank of Windsor*, 737 F.2d 1490, 1499 (8th Cir. 1984). At common law, the doctrine prevented a plaintiff from pleading alternative remedies or alternating between remedies once suit had commenced. *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1371 (7th Cir. 1990). With the adoption of more flexible approaches to pleading and procedure and the merger of law and equity, however, most jurisdictions today have abandoned this dimension of election of remedies doctrine. *See Schwartz v. Rockey*, 932 A.2d 885, 893 (Pa. 2007). Under the modern view, apart from issues of *res judicata* or where some element of estoppel is present, a conclusive election typically is made only where a suit has

advanced to judgment. *See Olympia Hotels*, 908 F.2d at 1371 (citations omitted).

It is clear that in West Virginia, election of remedies doctrine follows this trend.[1] In *Stone v. Kaufman*, 107 S.E. 295 (W. Va. 1921), the West Virginia Supreme Court allowed a plaintiff to sue for damages after dropping its earlier claim for specific performance. Moreover, West Virginia's Rules of Civil Procedure, which largely replicate the equivalent federal provisions, embrace the modern principles of notice pleading, pleading in the alternative, and the liberal amendment of pleadings that have supplanted the common law's more formalistic approach. *See* W. Va. R. Civ. P. 8(e) ("A party may set forth two or more statements of a claim or defense alternately or hypothetically. . . A party may also state as many separate claims or defenses as the party has regardless of consistency."); W. Va. R. Civ. P. 15 ("[L]eave [to amend pleadings] shall be freely given when justice so requires."). SPARC cites statements from earlier West Virginia cases to the effect that "[p]arties will not be permitted to assume successive inconsistent positions in the course of a suit." *MacDonald v. Long*, 131 S.E. 252, 253 (W. Va. 1926). Those decisions,

---

[1]We note that the sequencing component of election of remedies doctrine would likely qualify as "procedural" for purposes of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and *Hanna v. Plumer*, 380 U.S. 460 (1965), and that therefore the issue would likely be governed by federal law. Similar devices have been treated as procedural. *See Allen v. Zurich Insurance*, 667 F.2d 1162, 1167 n. 4 (4th Cir. 1982) (rules of judicial estoppel); *Hogue v. Sam's Club*, 114 F. Supp.2d 389, 391 n. 1 (D. Md. 2000) (rules concerning amendment of pleadings); *see also Green v. Altman*, No. 03-6437, 2004 WL 2106552, at *9 & n.10 (E.D.Pa. Sept. 21, 2004) (viewing the sequencing aspect of election of remedies doctrine as a matter of federal law under *Erie*); *Olympia Hotels*, 908 F.2d 1371 (same). As a matter of federal law, election of remedies doctrine no longer requires a party to elect a single remedy at the outset of suit. *Kansas State Bank in Holton v. Citizens Bank of Windsor*, 737 F.2d 1490, 1499 (8th Cir. 1984). The parties did not raise the *Erie* issue, however, and since we believe West Virginia election of remedies law provides the same result as federal law, we decline to rule upon it.

however, concern the narrower doctrine of judicial estoppel. *See West Virginia Dept. of Transp., Div. of Highways v. Robertson*, 618 S.E.2d 506, 513 (W. Va 2005). That doctrine bars a party from changing positions where the court has already made a ruling based on the party's earlier position and typically applies only where the other party was misled by the earlier position. *Id.* at 513-14 & n. 18. It is clear that as an ordinary matter, a plaintiff may seek specific performance at the outset of his breach of contract action and later change his mind and ask for damages instead.

## B.

Nor does West Virginia's substantive law of contracts provide a limitation that election of remedies doctrine does not. The prevailing view is that contract law typically should not prevent a plaintiff from substituting one contractual remedy for another. "Only if the other party has materially changed his position in reliance on the original choice is a shift to another remedy precluded by the election of the first." Restatement (Second) of Contracts § 378, cmt a. In light of *Stone v. Kaufman*, it is clear that West Virginia contract law generally adopts this view. *Stone* is explicit on the point: "The remedy of specific performance and by an action for damages for a breach of a contract are not inconsistent. Under the law, a party to a contract breached by the other may pursue not both but either remedy, as our cases on the subject so hold. So we find no merit in the point that plaintiff was barred by his suit for specific performance." *Stone*, 107 S.E. at 296.

Unlike this case, however, *Stone* involved an actual breach of contract, rather than a threatened, prospective one. We must therefore determine whether the doctrine of anticipatory breach, as construed by the courts of West Virginia, would prevent a plaintiff whose cause of action was based upon a repudiation from abandoning an initial claim for specific performance in favor of a claim for damages. We find that it does not.

The doctrine of anticipatory breach has a well-defined function. It allows a plaintiff to bring a breach of contract action immediately, rather than having to wait for the promised non-performance actually to occur, which could be some time well into the future. *See* Restatement (Second) of Contracts § 253(1). The doctrine gives the plaintiff the option to have the law treat the promise to breach as a breach itself. In this way, it operates as a doctrine of accelerated ripeness. *See Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002) (internal quotation marks omitted) ("[A] repudiation ripens into a breach prior to the time for performance only if the promisee elects to treat it as such.").

This is no small matter. Regardless of whether a plaintiff is seeking an injunction or damages, the right to go to court and bring an action on the basis of threatened non-performance is a valuable means for the plaintiff to secure the benefit of his bargain in the manner that is best for him and, possibly, the repudiating party as well. It provides both sides with certainty concerning their contractual rights and obligations.

But the doctrine of anticipatory breach, intended in significant part to work to the advantage of the non-repudiating party, cannot be turned on its head. A party who repudiates a contract cannot be allowed to force a non-repudiating party to forfeit a claim for damages simply because it initially held out the hope that the repudiating party would honor its side of the bargain after all. It is well settled in contract law that a non-repudiating party can encourage the repudiating party to withdraw the repudiation without forfeiting the right to bring an action for anticipatory breach if the repudiating party fails to do so. *See* Restatement (Second) of Contracts § 257 (1981) ("The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation."). It is the non-repudiating party who should generally be able to decide how to proceed after a repudiation. "[I]n a contract action where

one has been wronged and has a number of remedies, he may select the most efficient one." *Cochran v. Ollis Creek Coal Co.*, 206 S.E.2d 410, 415 (W. Va. 1974). The repudiating party should not be given the power to force the other's hand.

It appears that the district court's ruling was based upon a misreading of language in *Annon v. Lucas*, 185 S.E.2d 343 (W. Va. 1971). *Annon* stated that, when a repudiation occurs, "[t]here is no breach so long as the injured party elects to treat the contract as continuing." *Id.* at 350 (internal quotation marks omitted). This statement does not mean that failure to terminate a contract after it has been repudiated waives the right to sue for anticipatory breach. A party can certainly keep a contract alive and sue for anticipatory breach at the same time since West Virginia law expressly allows specific performance as a remedy for anticipatory breach. *Miller v. Jones*, 71 S.E. 248, 249 (W. Va. 1911). All that *Annon* meant is that the statute of limitations will not begin to run from the time of repudiation if the non-repudiating party decides to sue on the basis of a later actual breach, rather than the repudiation. *Annon*, 185 S.E.2d at 351 (citing Restatement (First) of Contracts § 322). *Annon* had nothing to do with a suit for specific performance and in no way suggested that when a non-repudiating party *does* bring an anticipatory suit, his initial choice to request one remedy will bar him from changing his mind during the litigation and recovering another.

In sum, we see no reason why, as a general matter, a party who initially seeks specific performance cannot later switch his preferred relief to an award of damages in the event that specific performance is rendered impractical or impossible—which, after all, is exactly what happened here. Moreover, the notion that an election has to be made at the time suit is filed is inconsistent with modern pleading practice. Consider that while the plaintiff in this case did not request both specific performance and damages as alternative remedies in its original complaint, it might well have done so. What election could it be said to have made then? In a system where plain-

tiffs are allowed to plead alternative theories of liability, there is no reason why they should be categorically forbidden to plead alternative theories of remediation.

## C.

Turning to the facts of this case, we find that HTC was not precluded from obtaining a damages award after it abandoned its claim for specific performance.

First, while anticipatory breach doctrine provides that a non-repudiating party loses the right to treat a repudiation as a breach if the repudiating party nullifies the repudiation, *see* Restatement (Second) of Contracts § 256, no such nullification took place. The principal way for a repudiating party to nullify its repudiation is by making a statement retracting it. *Id.* Not only did SPARC not retract its repudiation, it repeatedly reaffirmed it. After HTC responded to SPARC's October 17, 2007, repudiation of the contract, urging SPARC to retract, SPARC reiterated its desire to put an end to the contract, stating once again that the lease had been "terminated," in its letter of October 31, 2007. The October 31 letter was as unequivocal as the original repudiation, if not more so.

Several weeks later, HTC again wrote to SPARC, explaining that the repudiation was making it impossible to get financing and asking once more for a retraction. SPARC responded that it would accept the lease if HTC could verify that it had obtained financing within six weeks' time, but until and unless that happened, it would "neither admit nor deny the continued existence of the lease." This certainly was no retraction. As a matter of law, a statement must be unconditional to be effective as a retraction. *See Anderson Excavating & Wrecking Co. v. Sanitary Improvement Dist. No. 177*, 654 N.W.2d 376, 383 (Neb. 2002) (citation omitted); *Vahabzadeh v. Mooney*, 399 S.E.2d 803, 805 (Va. 1991). SPARC could not nullify its repudiation by trying to add new conditions to the lease. Not only that, the response was sent after HTC had

filed suit, and "an attempted retraction of a repudiation of a contract, after suit has been filed, is too late and is therefore ineffectual." 17A Am. Jur. 2d Contracts § 718. SPARC could have retracted its repudiation at any point between October 17, when it was sent, and December 4, when suit was filed. It never did so, and no retraction was ever effected.

A repudiating party may also be able to nullify its repudiation by performing under the contract if the non-repudiating party has not yet elected to treat the repudiation as a breach. *See* 17B C.J.S. Contracts § 540 (1999). The record, however, contains no indication that SPARC performed under the lease in the period between its repudiation on October 17, 2007, and HTC's filing suit, on December 4, 2007. Thus, while SPARC claims that it continued to perform by filing a second plat in March of 2008, that act came too late to nullify its earlier repudiation. Nor, for that matter, did it in any way suggest that SPARC had changed course and decided to perform under the lease. Throughout the litigation, SPARC maintained that the lease had terminated. It was not until after HTC moved to seek damages in place of an injunction that SPARC ever suggested the lease had any continuing vitality.

We see no reason then why HTC should be precluded from changing its request from one for specific performance to one for damages after filing its complaint. Since specific performance has never been decreed, there is no possibility of *de jure* double compensation if damages are now awarded. SPARC claims, however, that allowing HTC to recover damages would amount to *de facto* double recovery because the preliminary injunction provided HTC the injunctive relief it sought. The preliminary injunction, however, was not effective in giving HTC the benefit of its bargain. It proved insufficient to disperse the cloud of legal uncertainty that SPARC's repudiation had cast over HTC's business plans. This likely was for the very same reason that it does not qualify as *de jure* double recovery: it was "merely a temporary injunction entered to preserve the status quo." *Jim-Bob, Inc. v. Mehling*,

443 N.W.2d 451, 461 (Mich. App. 1989); *see also Southern Christian Leadership Conference v. Al Malaikah Auditorium Co.*, 281 Cal. Rptr. 216, 226 (Ct. App. 1991); *Preiss/Breismeister Architects v. Westin Hotel Co.-Plaza Hotel Div.*, 437 N.E.2d 1154, 1154 (N.Y. 1982). It provided no assurance to HTC or its prospective creditors that the lease would ultimately be enforced. To ignore the provisional character of a preliminary injunction in the context of election of remedies would be to impose upon plaintiffs a Hobson's choice "of seeking the injunction to preserve the status quo and thereby being relegated to seeking only specific performance or foregoing the injunction and risking being forced to seek damages in a situation in which the legal remedy may be inadequate." *Jim-Bob*, 443 N.W.2d at 461.

Election of remedies doctrine is also grounded in estoppel, and we consider the possibility that damages are now foreclosed because SPARC changed position in reliance on HTC's earlier manifestations. *See* Restatement (Second) of Contracts § 378. SPARC contends that it spent "hundreds of thousands of dollars improving the Lease property's infrastructure before and after the alleged repudiation" and that it performed under the lease by filing the second plat. Cross-Appellant's Reply Br. at 8. It is only conduct caused by HTC's decision to pursue specific performance that matters, however. Thus, the only efforts by SPARC of any possible relevance are those undertaken *after* HTC had received the repudiation and expressed an intention not to terminate the contract. In this regard, we call attention to SPARC's own claim at the outset of this litigation that it had "no plans to release or otherwise affect the disputed property. . . ." We also note that, in issuing the preliminary injunction, the district court specifically found that if SPARC were to prevail on the merits, a provisional order to keep the lease alive while HTC sought financing would not have caused any significant harm to SPARC that could not be satisfied by HTC's $60,000 bond.

Doubtless, there are some costs that SPARC incurred as a result of SPARC's decision initially to seek specific perfor-

mance, particularly as relates to surveying the property and obtaining permits. On the record of this case, however, we cannot conclude that they precluded HTC from altering its remedial request. SPARC's own conduct ensured that specific performance could not succeed. SPARC refused to provide the assurances that HTC needed in order to salvage the arrangement contemplated in the lease. In such circumstances, it would be improper not to allow HTC to amend its request after discovering the futility of its initial efforts to rescue the deal. HTC was not unreasonable in supposing at the time it filed suit that a simple order of specific performance would place the project back on track. This, of course, proved too sanguine, and it is now apparent that if HTC cannot have damages, it can have no remedy at all. In our view, it would be inappropriate to allow one who repudiates a contract and thereby irreparably damages the contractual venture to invoke the very conditions it helped to create in order to prevent the other party to the contract from obtaining any relief. It is a familiar maxim that "he who seeks equity must do equity." *Everly v. Peters*, 397 S.E.2d 416, 418 (W. Va. 1989) (citations omitted).

We conclude, therefore, that there is no reason why HTC may not now obtain an award of damages occasioned by SPARC's repudiation of the contract. What the measure of damages may be is a matter for remand. We hold only that West Virginia law provides no *per se* bar or indeed a bar in this case to plaintiff's amending its request for specific performance to seek damages instead.

## V.

For the foregoing reasons, we affirm the district court's conclusion that SPARC has no valid breach of contract claims to bring against HTC and that SPARC repudiated the contract. We reverse the district court's conclusion that an award of monetary damages against SPARC was precluded by HTC's earlier request for specific performance, and we remand for

trial on the issue of damages caused by SPARC's breach.[2] To hold otherwise would allow a party repudiating a contract to deny the party who stuck by the bargain any remedy. The judgment is hereby

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*.

DAVIS, Circuit Judge, dissenting in part and concurring in part:

I agree with the disposition of SPARC's cross-appeal in Part III of the Majority Opinion. I am unable to join my fine colleagues in the majority, however, in the disposition of the appeal by HTC. The majority asserts that HTC's suit "sought a preliminary injunction, which was granted shortly thereafter, and requested an order of specific performance." Maj. Op. at 6. Unlike the majority, but like the district court, I am persuaded that the preliminary injunction sought and obtained by HTC was the very "order of specific performance" it sought by filing this suit in December 2007.

As the district court recognized, at the time of SPARC's alleged breach, the preliminary injunction (despite the nomenclature) afforded HTC complete relief for the very breach of contract in consequence of which it sought a remedy from the district court. J.A. 983-85. West Virginia contract law is clear: a party may obtain either specific performance of a contract, or damages flowing from a breach of a contract, but not both. *Stone v. Kaufman*, 107 S.E. 295, 296 (W. Va. 1921) ("The remedy of specific performance and by an action for damages for a breach of contract, are not inconsistent. Under the law, a party to a contract breached by the other may pursue not both but either remedy, as our cases on the subject all hold."). Thus, the effect of the majority's remand for a trial on dam-

---

[2]We also vacate the district court's denial of attorneys' fees to HTC.

ages gives HTC two bites of an apple under circumstances in which West Virginia law permits it only one bite. *Id.*

To be sure, whether SPARC's posturing in connection with, and after delivery of, the October 17, 2007 letter constitutes an actionable repudiation of the agreement presents a close question in my view, one not comfortably resolved as a matter of law.[1] Certainly, there is no evidence in the record that SPARC had a third party waiting in the wings with which it could quickly do business. Thus, the majority's assertion that SPARC "was seeking to get out of the contract as fast as it could," Maj. Op. at 10, is curious.[2] But accepting the district court's conclusion that HTC was entitled to treat the letter as an anticipatory repudiation, and thus as an actionable breach of contract, it is clear that what HTC was entitled to under West Virginia law was to make a choice:

> [1] treat the contract as rescinded, and recover on quantum meruit so far as [it] ha[d] performed; . . . [2] keep the contract alive for the benefit of both parties, being at all times ready and able to perform, and at the end of the time specified in the contract for performance, sue and recover under the contract; or [3] treat the repudiation as putting an end to the contract, and sue for the profits [it] would have realized if [it] had not been prevented from performing.

Point 1, syllabus, *Annon v. Lucas*, 185 S.E.2d 343 (W. Va. 1971) (brackets and alteration added).[3]

---

[1] *See Mollohan v. Black Rock Contracting, Inc.*, 235 S.E.2d 813, 816 (W. Va. 1977) (quoting *Dingley v. Oler*, 117 U.S. 490, 502 (1886)) ("An anticipatory repudiation must be 'a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.'"); *Wood County Airport Auth. v. Crown Airways, Inc.*, 919 F. Supp. 960, 967-69 (S.D.W. Va. 1996).

[2] Indeed, in its preliminary injunction opinion, the district court specifically found that "[SPARC] . . . has no present plans to re-lease or otherwise affect the disputed property." J.A. 346.

[3] "[T]he syllabus . . . is the law in West Virginia." *Union Trust Co. of Maryland v. Townshend*, 101 F.2d 903, 910 (4th Cir. 1939).

It is clear to me that HTC chose option number three: it treated the repudiation as an actionable breach of contract and persuaded the district court to accept that characterization. Rather than sue then and there for lost profits and the benefit of its bargain, however, it sought and obtained the alternative remedy of *specific performance*.[4] The effect of the preliminary injunction (that is, the order of specific performance) was threefold: (1) it precluded SPARC from entering into any alternative arrangement with respect to the land with a willing third party; (2) it affirmatively required SPARC to perform fully its contractual undertakings going forward, i.e., to record a proper "final plat" and to forebear from any further acts or omissions inconsistent with the parties' agreement; and (3) it permitted HTC to continue, as contemplated by the parties' agreement, its quest for financing that would have been critical to its consummation of the deal.[5] Having foregone a claim for damages, HTC received all to which it was entitled.

---

[4]Of course, it is not at all surprising that HTC did not seek money damages (in the form of lost profits) in December 2007 because it almost certainly would have encountered a wholesale failure of proof at that time. This is true notwithstanding that HTC repeatedly assured the district court at the time of the preliminary injunction hearing that financing for the deal was well in hand. J.A. 346 ("HTC has secured acceptable financing for the project."). In any event, as the majority acknowledges, Maj. Op. at 19, the measure of damages in the unusual circumstances of this case will be for the district court to fathom in the first instance.

[5]The district court's injunction ordered:

> . . . that SPARC and the Trust are hereby enjoined from selling or re-leasing the property in question for a period of 120 days from the December 18, 2007, hearing, or April 16, 2008. SPARC and the Trust are further enjoined from taking any actions with respect to the Lease which are inconsistent with the terms of the Lease as if the same remain in full force and effect. During this period, HTC may exercise its rights under the Lease to continue the project going forward with respect to financing, inspection, and other issues preliminary to construction.

J.A. 346-47.

The majority concludes, to the contrary, that HTC chose option two, that is, "it kept the contract alive." But how did HTC keep the contract alive? *It obtained an order of specific performance requiring SPARC to perform.* Most assuredly, as the district court recognized, this is not what West Virginia law anticipates.

If A contracts to sell land to B for $100, but A gets a better offer in the meantime and threatens to sell to C for $200, then B has a choice to make. B can sue A (because B claims an entitlement to the apparent $100 increase in the value of the land, and thus the benefit of his bargain) and B can seek, at the commencement of the suit, in the alternative, specific performance and damages. In particular, B can choose to allow A to sell to C and limit his damages claim against A to the disputed $100 profit. On the other hand, however, at B's insistence, the court will compel A to go through with his deal with B and sell to B at $100. If, thereafter, C changes his mind and decides not to buy from B for the $200 he had offered A, surely B could not then seek damages of $100 from A on a theory of breach of contract. But that seems to me to be the import of the majority's approach in this case.

I take a different view of the record. Just as B obtained complete relief (specific performance) in the above scenario, HTC obtained complete relief before the district court, namely, SPARC's full performance of any and all of its contractual undertakings that were due on and after the issuance of the preliminary injunction.[6] Contrary to the majority's

---

[6]The district court described the effect of HTC's decision to seek and obtain specific performance by SPARC as a "forfeiture" of its damages claim. J.A. 985. Whether or not that characterization is the most apt, the district court was surely correct in reasoning that HTC had achieved all the relief to which it was entitled by virtue of the preliminary injunction:

> [N]o genuine issue of material fact exists with regard to whether or not the parties continued to perform under the Lease following the repudiation. . . . [I]t is uncontested that [SPARC] continued

view, HTC did not "change its mind" *see* Maj. Op. at 12-13, or "abandon[ ] its claim for specific performance." *Id.* at 16. HTC could not "change its mind" because it had already received what it wanted and what it proved it was entitled to: specific performance.

There is not a scintilla of evidence in the record to suggest that SPARC committed any *further* breach of contract after the district court issued its preliminary injunction and after the parties had "continued to perform." *See supra* note 6.[7] Eventually, as it was entitled to do, HTC elected to abandon the agreement when it failed to obtain the financing necessary to continue with the deal, notwithstanding the "make whole" relief it had obtained from the district court.[8]

---

performance under the Lease by securing approval of the final plat from the Jefferson County Planning Commission and by recording the same in the office of the Clerk of the County Commission of Jefferson County.

J.A. 985.

[7]It appears that the unspoken theory of HTC, implicitly embraced by the majority, is that simply by requiring HTC to file a lawsuit, SPARC thereby cast something of a pall over the deal, possibly scaring off potential lenders and investors. As a matter of West Virginia law, it is doubtful that SPARC owed HTC some extra-contractual duty to display public enthusiasm for the deal. At all events, HTC surely foresaw that some if not many potential investors would not look benignly at the December litigation, and this would be particularly true during the nationwide economic collapse of late 2007. *See* J.A. 346 ("This Court recognizes the difficulties in the mortgage market over the last year."). This is yet a further indication that HTC made a binding election of remedies in December 2007.

[8]As the majority notes and as the district court recognized, the parties' agreement was structured such that there were two separate and distinct parts to the agreement. The first part essentially required affirmative performance by both parties, i.e., to obtain the necessary permits and financing for the project, and to fashion and record the "final plat." The second part laid out terms for the actual construction of the buildings and leasing of the land. J.A. 30-47. Bifurcating the two parts of the contract was an election clause, which effectively allowed HTC to terminate the agreement going forward if it was unable to secure financing:

Thus, with one exception, I would affirm the district court's order dismissing this case as fully heard and resolved. I would vacate the district court's order insofar as it denied attorney's fees to HTC and remand the case for consideration by the district court whether fees should be awarded. Consistent with the views expressed above, I would permit HTC to argue that it was a "prevailing party" because it persuaded the district court to issue an order of specific performance, i.e., the preliminary injunction.[9]

With respect, I dissent.

---

Until all of the conditions set forth in Paragraph 3 herein are satisfied, Tenant may terminate this Lease by giving written notice to Landlord as provided herein, and this Lease shall be of no further force or effect, except for such matters which are designated to survive the termination of this Lease and except for any payment obligations pursuant to Paragraph 6(B) herein.

J.A. 32.

At that point, if HTC elected not to go forward with the Lease, the agreement would naturally terminate, releasing both parties from further performance.

[9]A party may prevail, for the purposes of an award of contractual attorney's fees, in any one (or more) of three ways: (1) by winning the lawsuit; (2) by prevailing on the principal issues; and (3) when there is a causal connection between the lawsuit and a change in the defendant's conduct. *See Daily Gazette Co., Inc. v. West Virginia Dev. Office*, 521 S.E.2d 543, 553-54 (W. Va. 1999) (construing statutory fee-shifting provision allowing an award of fees to a "successful party"). Arguably, HTC was a prevailing party in that it obtained an order for specific performance; presumably, any award of attorney's fees would cover only the fees incurred in obtaining the preliminary injunction.